SOCIETY HILL CIVIC ASSOCIATION, Concerned Citizens in Opposition to the Dilworth Development Proposal, Donald and Barbara Haviland, Appellants

v.

PHILADELPHIA ZONING BOARD OF ADJUSTMENT, City of Philadelphia, John and Mary Turchi.

Commonwealth Court of Pennsylvania.

Argued Feb. 14, 2012.

Decided April 9, 2012.

Reargument Denied May 25, 2012.

Paul Boni, Philadelphia, for appellant Society Hill Civic Association.

Donald E. Haviland, Jr., Philadelphia, for appellants Donald and Barbara Haviland.

Carl S. Primavera, Philadelphia, for appellant Concerned Citizens in Opposition to the Dilworth Development Proposal.

Ralph S. Pinkus, Philadelphia, for appellee Athenaeum of Philadelphia.

Neil Sklaroff, Philadelphia, for John and Mary Turchi.

BEFORE: LEADBETTER, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION BY Judge SIMPSON.

In this zoning appeal, Concerned Citizens in Opposition to the Dilworth Development Proposal (Concerned Citizens), the Society Hill Civic Association (Civic Association) and Donald and Barbara Haviland (the Havilands) (collectively, Objectors) ask whether the Court of Common Pleas of Philadelphia County (trial court) erred in affirming a decision of the Philadelphia Zoning Board of Adjustment (ZBA) that granted a variance and special use permit to John J. Turchi, Jr. and Mary E. Turchi and the Athenaeum of Philadelphia (collectively, Applicants) in connection with Applicants' proposed renovation and development of a historically designated building, the Dilworth House in the City of Philadelphia.[1] Objectors primarily assert the ZBA erred in: unfairly limiting the scope of the hearings; and, granting Applicants' variance request where Applicants' did not prove the requisite unnecessary hardship and any asserted hardship was self-inflicted. Because we agree with Objectors that the ZBA erred in granting the requested variance and unfairly limited the scope of

the hearings, we reverse in part, vacate in part, and remand for further proceedings.

## I. Factual and Procedural Background

The ZBA issued a lengthy decision, which includes 141 findings of fact and 74 conclusions of law. We summarize the ZBA's pertinent findings and conclusions as follows, supplemented briefly by the record where necessary.

On May 13, 2008, Applicants, through counsel, applied to the Philadelphia Department of Licenses and Inspections (L & I) for a zoning/use-registration permit to allow construction of a 16–story structure at 223–25 South 6th Street (subject property), with a breach in the wall of 219–21 South 6th Street, for 12 dwelling units and a library, with 13 accessory parking spaces.

The subject property is located in a C–4 Commercial zoning district, which permits residential use, and it is subject to the Special Controls for the Washington Square Area. The subject property is bounded by St. James Street to the north, South 6th Street to the west, and Randolph Street to the east. Reproduced Record (R.R.) at 105a. A pedestrian street, known as St. James Place (also known as Locust Walk) is located to the south. *Id.* St. James Street is a 14–foot wide, one-way eastbound cobblestone road that provides access from South 6th Street to South 5th Street. *Id.* Randolph Street is a two-way, 14–foot, 6 inch-wide road that extends from St. James Street to the St. James Place pedestrian street where it

---

1. In April 2011, this Court decided a case involving the proposed renovation and development of the Dilworth House as it related to the Turchis' request for a permit from the Philadelphia Historical Commission. *See Turchi v. Phila. Bd. of License & Inspection Review,* 20 A.3d 586 (Pa.Cmwlth.2011). There, the Board of License and Inspection Review (Board) reversed the Historical Commission's grant of the requested permit to allow the proposed renovation and development. Ultimately, this Court remanded to the Board for it to issue a new decision affording proper deference to the Historical Commission.

ends. *Id.* Randolph Street provides access to the St. James Place and Lippincott residential buildings and their parking facilities. *Id.* Applicants propose access to an accessory parking area at Randolph Street via St. James Street. *Id.* at 104a–05a; *see* R.R. at 93a, 101a.

On May 23, 2008, L & I issued a refusal of Applicants' application because the proposal lacked an off-street loading area. L & I also referred the application to the ZBA because the proposed provision for parking would constitute a garage above grade, which required a special use permit.

Applicants appealed to the ZBA. During the pendency of Applicants' appeal to the ZBA, L & I reviewed its initial notice of refusal and concluded the notice erroneously classified the requested parking area as a "garage," and instead indicated the area should be classified as a "parking lot," which also required a special use permit under Section 14–305(a)(3) of the Philadelphia Zoning Code (Zoning Code). *See* Memorandum of 8/14/08 from Jeanne Klinger of L & I to the ZBA (Klinger Memorandum). The Klinger Memorandum also stated the refusal should contain a notice that a copy of a purported "unity of use" agreement between the Turchis and the Athenaeum must be provided before a zoning permit is issued and must be recorded before a building permit is issued.

The ZBA subsequently held hearings on Applicants' appeal in September and November 2008, and February 2009.

At the first hearing, both Applicants and Objectors appeared with counsel. However, because Objectors had not received a copy of the Klinger Memorandum, and because it appeared the hearing would be lengthy, the ZBA continued the hearing.

At the second hearing, the Havilands asserted that Objectors did not receive notice of the date of the hearing, and Objectors did not learn of the hearing until approximately a week before the hearing date.

For their part, Applicants asserted Objectors lacked standing to challenge L & I's notice of refusal as inaccurate or incomplete because Objectors did not appeal the refusal as required by Section 14–1705 of the Zoning Code (appeals to the ZBA may be taken by any person aggrieved by any decision of L & I).

Counsel for Concerned Citizens argued that when his clients, who are owners and residents of nearby properties, learned of the issuance of L & I's notice of refusal, they attempted to file an appeal on August 15, 2008, but the appeal petition was refused as untimely by the ZBA Administrator.

The ZBA then called Jeanne Klinger, the head of L & I's zoning section, to testify regarding L & I's action on Applicants' proposal. With regard to the parking area, Klinger testified the proposal contemplates that four parking spaces would be completely uncovered, eight parking spaces would be partially covered, and only two parking spaces would be completely covered by the proposed building, so she determined the proposed parking area should be classified as an "accessory parking lot" rather than a "garage" as initially noted in the refusal.

Klinger further testified that both the Turchis' lot and the Athenaeum's lot were considered as one lot because of a "unity of use" agreement between those parties. Klinger testified that when applicants propose a unity of use for two or more properties, L & I reviews the application with the understanding that the unity of use will take place as described, but it does not require a copy of the unity of use agreement until just before issuance of a zoning permit.

For their part, Applicants presented the testimony of Carey Jackson Yonce, an architect. By way of background regarding the area at issue, Yonce explained the existing Athenaeum building houses architectural archives and is one of the few national historic landmarks in Philadelphia. He also identified the building known as the Dilworth House, which was built in 1957 for then-Mayor Richardson Dilworth. He testified the Dilworth House is listed on the Philadelphia Historic Register. According to Yonce, when the Dilworth House was built, two existing row homes were demolished, causing the south wall of the Athenaeum to deteriorate slowly over time. Among other things, Applicants planned to address that deterioration and provide storage space for the Athenaeum's collection in the proposed building on the subject property.

Yonce explained that Applicants propose to erect a 16-story residential tower with 12 full floor dwelling units (including a double-height penthouse on the top two floors) behind the existing Dilworth House. Due to the height of the penthouse, L & I classified the structure as a 17-story building. Applicants plan to renovate the existing Dilworth House, with the ground floor constituting part of the lobby and the upper floors housing office and possibly additional condominium uses. The existing "L" on the back of the Dilworth House would be removed, which is the subject of a pending appeal following the Historical Commission's approval. Applicants also plan to construct a "connection from the second level of the Athenaeum over to a storage level in the new project that will provide some valuable conditioned, easily accessible storage space for the Athenaeum to use." R.R. at 311a.

According to Yonce, there is insufficient space between the buildings facing 6th Street to provide a driveway. Thus, Applicants propose to provide surface parking at the rear of the subject property, entering from Randolph Street. The proposed parking area would contain 13 spaces, one for each apartment, and one additional space. Yonce explained his firm also considered an option, which included 12 parking spaces and a loading dock, but the firm determined "a truck that was designed for a space [the size of the loading area] would never be able to maneuver into the property." R.R. at 314a. Significantly, on cross-examination, Yonce conceded the subject property could be used as a single-family home. R.R. at 313a.

Counsel for the Civic Association stated Objectors intended to cross-examine witnesses and present evidence on other grounds for refusal they believed L & I overlooked when considering Applicants' application. However, the ZBA ruled the hearing would be limited to the issues raised by L & I's refusal, as corrected by the Klinger Memorandum.

Counsel for the Havilands sought to elicit testimony from Yonce regarding the amount of space, if any, Applicants proposed for the area between the wall of their new building and the wall of the existing Lippincott Building, which is located immediately to the south of the subject property. The ZBA did not allow this questioning on the ground the questions were beyond the scope of the direct examination of Yonce.

Applicants also presented the testimony of Karen Jehanian, President of KMJ consulting, who is an experienced traffic engineer. Jehanian testified her firm performed a traffic impact analysis, and concluded the proposed residential units and parking area would not substantially increase congestion, adversely affect transportation or unduly burden public facilities. As to the loading space requirement, Jehanian testified the maximum size truck that could access the proposed

parking area would be a standard passenger van. She testified a garbage truck could not gain access.

Applicants also presented the testimony of G. Craig Schelter, a city planning expert. Schelter testified he believed a variance from the loading area requirement was justified. Schelter testified the access problem along narrow Randolph Street is a unique hardship that is related to the property, and the only alternative would be to alter the wall of the Athenaeum, which is a national landmark property. R.R. at 323a. According to Schelter, the application met all the Zoning Code's variance criteria, and the absence of a loading dock would not adversely affect the public interest. Also, according to Schelter, the proposed parking lot met all the Zoning Code requirements for a special use permit.

Importantly, on cross-examination, Schelter explained the Zoning Code's loading area requirement was triggered by the fact that the proposed building exceeds 50,000 square feet. He conceded a variance would not be necessary if the proposed building was less than 50,000 square feet. R.R. at 328a.

At the conclusion of the second hearing, and prior to Objectors' presentation of their case, the ZBA indicated it would limit the evidence to issues raised by L & I's refusal, as corrected by the Klinger Memorandum.

At the third hearing, Objectors presented evidence in opposition to the requested variance. Specifically, Objectors presented the testimony of Benita Fair–Langsdorf, who resides at 227 South 6th Street at the Lippincott Building, which adjoins the subject property. Fair–Langsdorf testified she is a member of the condominium association in the Lippincott Building as well as a member of the Civic Association. Fair–Langsdorf testified her major concern regarding Applicants' proposed project is traffic congestion because Randolph Street is extremely narrow, and the residents of the 27 units in her building have basement parking spaces that depend on Randolph Street for ingress and egress. Fair–Langsdorf testified that residents in her building already compete with residents of St. James Court, who often stop on Randolph Street while they unload groceries, receive deliveries and go in and out for other reasons. Additionally, according to Fair–Langsdorf, the residents of her building have to cope with many delays resulting from trucks servicing the Penn Mutual Building on St. James Street.

Donald E. Haviland, Jr., testified he is a lawyer who appeared on his own behalf because his lawyer was unavailable. He resides with his wife and three children in the unit he owns in the northeast corner of the second floor of the Lippincott Building, which has four windows that directly overlook the subject property. Haviland testified regarding his concerns over traffic congestion in the area. He also submitted various exhibits, including a letter from City Councilman Frank DiCiceo in opposition to the proposed project, as well as photographs and a DVD with video clips of traffic conditions in the area.

Haviland testified it was not necessary for Applicants to have the entrance of their parking lot on Randolph Street. Instead, Applicants could use an entrance from St. James Street and the parking lot at the rear of the Athenaeum to enable trucks to reach a loading dock and parking lot in the rear of the proposed building. According to Haviland, providing access through the Athenaeum parking area to the proposed parking lot would alleviate a great deal of interference he anticipates would affect residents of the Lippincott Building as a result of the addition of a 12–vehicle parking lot on Randolph Street.

Haviland also disagreed with three opinions expressed by Applicants' traffic engineer: (1) that Applicants' proposal would not have a material impact on traffic during peak hours; (2) that there is no problem regarding sight distance; and, (3) that it is impossible for a truck to gain access to a loading dock in the proposed parking area. With regarding to the loading area, Haviland testified he observed a loading dock in the rear of the Lippincott building when it was previously used as a publishing house. Further, Haviland presented photographs and video of a full-sized garbage truck making a pickup at the Lippincott building. Contrary to Jehanian's testimony, Haviland also testified trucks of all types shown in his photographs routinely make the turn from 6th Street onto St. James Street. Haviland testified existing traffic congestion blocks his own access at least twice a week. According to Haviland, adding a 12–space parking lot in the unusually narrow, dead-end block of Randolph Street would create a unique burden, especially because the possibility of access directly from St. James Street makes it unnecessary.

In addition, Haviland pointed to an engineering report from Pennoni Associates, Inc. detailing substantial structural and maintenance issues with the north wall of the Lippincott Building. He asserted L & I should have refused Applicants' proposal based on its alleged failure to comply with the Zoning Code's side yard requirement.

Objectors then briefly cross-examined Klinger regarding the issues raised in L & I's refusal.

Objectors also presented the testimony of Larry Burstein on behalf of Concerned Citizens. Burstein testified he lives in a unit at 233 South 6th Street, which is known as Independence Place Towers. Burstein testified Concerned Citizens are individuals who live at Independence Place as well as in the Lippincott Building and in St. James Place, and who are vehemently opposed to Applicants' proposal. According to Burstein, he overlooks the subject property, and he can see both the front and back of the existing house from his unit on the 23rd floor. Burstein testified that the proposed construction would decimate the area for perhaps up to two years, that the proposed project would look like an appendage behind the existing house, and that it would be better for the Dilworth House to remain a single-family dwelling.

Ultimately, the ZBA found Fair–Langsdorf, Haviland and Burstein are all nearby neighbors of the subject property, so they were persons aggrieved by L & I's alleged failure to find all the shortcomings in Applicants' application, which Objectors allege exist. The ZBA further found that Civic Association and Concerned Citizens, both of which have numerous members who reside near the subject property, were persons aggrieved on behalf of their members by L & I's alleged failure to identify all the alleged shortcomings in Applicants' application. Thus, the ZBA found Fair-Langsdorf, Haviland, Burstein, Civic Association and Concerned Citizens would all have had standing to file a timely appeal from L & I's refusal.

However, the ZBA ruled, Objectors' appeal, which was filed on August 15, 2008 from L & I's May 23, 2008 notice of refusal was untimely as it exceeded the 30–day appeal period. The ZBA recognized an appellant may file an appeal after the 30–day appeal period if he proves he did not know, and was not put on notice of the issuance of the notice of refusal until sometime after it was issued. However, the ZBA stated, it was unable to make a finding that Objectors lacked such notice here because they did not present sufficient evidence to support such a finding.

As to the merits, the ZBA stated it found the testimony of Haviland and Fair–Langsdorf appealing and persuasive regarding the traffic congestion they presently face on Randolph and St. James Streets. However, on balance, the ZBA was persuaded by the testimony of Applicants' traffic engineer that any additional problems created by traffic to and from the proposed 13–space lot behind Applicants' proposed building would be negligible. Specifically, the addition of 11 vehicle trips during rush hour is simply not likely to make the present bad situation noticeably worse.

The ZBA further stated that if Applicants followed Objectors' advice and created an entrance to their parking lot through the rear yard of the Athenaeum, so they could also install a useful loading dock, it would create additional truck traffic to add to the existing congestion on St. James Street. On balance, the ZBA stated, Applicants' proposal to create a parking lot for 12 or 13 vehicles with an entrance on Randolph Street, but no loading dock, is likely to be less inconvenient for the neighbors than the creation of a loading dock and entrance for cars and trucks through the rear yard of the Athenaeum.

As to Applicants' requested variance from the loading area requirement, the ZBA found the subject property is unique because of the presence of the Dilworth House and because of the historic surroundings, all of which make reasonable development very difficult. The ZBA found the inability to create motor vehicle access from 6th Street and the difficulty of creating a loading dock that would actually be useful and accessible by trucks in the rear of the subject property, created an unnecessary hardship with regard to the Zoning Code's loading dock requirement.

The ZBA further found that relieving Applicants from the loading dock requirement was the minimum variance necessary to alleviate the hardship created by the existing configuration and historic status of the existing structures on and adjacent to the subject property. The ZBA also found "the special conditions and circumstances forming the basis for the variance did not result from the actions of the Applicants." ZBA Op., Findings of Fact (F.F.) No. 130; Concl. of Law No. 45.

In addition, the ZBA determined the grant of the requested variance and special use permit would not substantially injure use of adjacent properties. The ZBA also stated the record lacked evidence to support the expressed concern that the new building would be set back from the Lippincott Building just enough to make it impossible to perform needed service and repairs.

In sum, the ZBA determined Applicants' proposal satisfied all of the Zoning Code's criteria for the requested variance from the off-street loading area requirement, and the requested special use permit for the accessory parking lot. Thus, the ZBA granted Applicants' requested relief. Objectors filed separate appeals to the trial court, which consolidated the appeals for disposition.

Without taking additional evidence, the trial court affirmed. This appeal by Objectors followed.

## II. Issues

■ Concerned Citizens, Civic Association and the Havilands filed separate briefs. On appeal,[2] Objectors raise numer-

---

**2.** Because the parties presented no additional evidence after the ZBA's decision, our review is limited to determining whether the ZBA committed an abuse of discretion or an error of law. *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807 (Pa.Cmwlth.2005). The ZBA is the fact-finder here. *Id.*

ous issues, which we consolidate and re-order for review. Essentially, they argue the ZBA erred in: (1) granting Applicants' request for a variance from the loading area requirement where Applicants did not prove the requisite unnecessary hardship, and any alleged hardship was self-inflicted; (2) precluding Objectors from fully presenting evidence and questioning witnesses as to the alleged errors L & I made in its review of Applicants' proposal; (3) recognizing and applying the "unity of use" concept; and, (4) granting Applicants' request for a special use permit for an accessory parking lot.

## III. ZBA's Grant of a Variance from the Zoning Code's Loading Space Requirement

■ Objectors argue the ZBA erred in granting a variance to allow Applicants' proposed project to omit a single loading space that was required by the Zoning Code. Objectors maintain the loading space was required due to the massive size of the project, which is over 90,000 square feet in floor area. They contend Applicants failed to prove unnecessary hardship as the only justification for the failure to include the loading space was the fact that a truck could not make the turn into the rear of the subject property. Objectors assert this is insufficient proof of hardship under well-established case law, since the justification for the variance was clearly a self-inflicted hardship, driven by the massive size of the project (if the project was less than 50,000 square feet, no loading dock would be required). Thus, Objectors argue the ZBA erred in granting the variance.

Objectors further maintain there was undisputed evidence that the Dilworth House, as it currently stands, can be used as a single-family dwelling, which is compliant with the Zoning Code. See R.R. at 313a, 400a. As such, they argue there is simply no hardship because the subject property, which is already developed, can be used productively in its current condition.

Objectors contend that even under the relaxed *Hertzberg*[3] standard for grant of a dimensional variance, Applicants are not entitled to relief because their need for a variance stems from their desire to construct a large, and likely extremely profitable, luxury high rise condominium tower, and not by any unique physical characteristics of the subject property. *See, e.g., Evans v. Zoning Hearing Bd. of Borough of Spring City*, 732 A.2d 686 (Pa.Cmwlth. 1999) (rejecting variance request to add new apartment structure to existing single-family dwelling where property was already used for permitted purpose); *see also Ken–Med Associates v. Bd. of Twp. Supervisors of Kennedy Twp.*, 900 A.2d 460 (Pa.Cmwlth.2006) (rejecting request for dimensional variance where asserted hardship arose from landowner's desire to maximize profitability of office building).

■ Whether an applicant is seeking a dimensional or use variance, it must show unnecessary hardship will result if a variance is denied and that the proposed use will not be contrary to the public interest. *Hertzberg*. It is only the stringency of the standard in proving an unnecessary hardship that varies, depending on whether a use or dimensional variance is sought. *Id.*

■ To justify the grant of a dimensional variance, courts may consider multiple factors, including "the economic detriment to the applicant if the variance was denied, the financial hardship created by any work

3. *See Hertzberg v. Zoning Board of Adjustment of the City of Pittsburgh,* 554 Pa. 249, 721   A.2d 43 (1998).

necessary to bring the building into strict compliance with the zoning requirements and the characteristics of the surrounding neighborhood." *Id.* at 264, 721 A.2d at 50.

■ However, this Court consistently rejects requests for dimensional variances where proof of hardship is lacking. Where no hardship is shown, or where the asserted hardship amounts to a landowner's desire to increase profitability or maximize development potential, the unnecessary hardship criterion required to obtain a variance is not satisfied even under the relaxed standard set forth in *Hertzberg.* *See, e.g., Singer v. Zoning Bd. of Adjustment of City of Phila.,* 29 A.3d 144 (Pa. Cmwlth.2011) (rejecting applicant's request for dimensional variances from Zoning Code's parking, floor area ratio and loading dock requirements where asserted hardship amounted to applicant's desire to maximize development potential of property); *Lamar Advantage GP Co. v. Zoning Hearing Bd. of Adjustment of City of Pittsburgh,* 997 A.2d 423 (Pa.Cmwlth.2010) (rejecting applicant's request for dimensional variance for proposed sign where only asserted hardship involved alleged benefit to community and increase in income); *Twp. of Northampton v. Zoning Hearing Bd. of Northampton Twp.,* 969 A.2d 24 (Pa.Cmwlth.2009) (rejecting applicant's request for variance from ordinance's off-street parking requirements where no evidence of hardship presented even under relaxed *Hertzberg* standard and evidence revealed applicant could use property in a manner consistent with ordinance requirements); *In re Boyer,* 960 A.2d 179 (Pa.Cmwlth.2008) (rejecting applicant's requests for dimensional variances from ordinance's steep slope and setback requirements in order to construct in-ground pool where no evidence of hardship presented even under relaxed *Hertzberg* standard); *One Meridian Partners, LLP v. Zoning Bd. of Adjustment of City of Phila.,* 867 A.2d 706 (Pa.Cmwlth.2005)

(rejecting request for dimensional variance from floor area ratio and height requirements where asserted hardship was essentially financial in nature); *Yeager v. Zoning Hearing Board of City of Allentown,* 779 A.2d 595 (Pa.Cmwlth.2001) (rejecting applicant's request for dimensional variances from ordinance's setback and clear sight triangle requirements where only hardship amounted to applicant's desire to construct a building for its new car dealership that complied with specifications required by vehicle manufacturer).

Here, it is undisputed that the Zoning Code requires one loading space for Applicants' proposal because the project exceeds 50,000 square feet. *See* Section 14–305(14)(c)(2) of the Zoning Code. Applicants sought a variance so as to eliminate this requirement.

In considering Applicants' variance request, the ZBA determined Applicants proved unnecessary hardship so as to entitle them to a variance from the loading area requirement. *See* ZHB Op., Findings of Fact (F.F.) Nos. 126–127, 129. Specifically, the ZBA credited the testimony of Applicants' traffic engineer that a variance was required because a truck could not access a loading area in the rear of the subject property due to the narrowness of the streets. F.F. Nos. 47, 48, 52–53, 64–66; Notes of Testimony (N.T.), 11/5/08 at 55–60, 61, 84–86, Applicants' Ex. 12. Further, the ZBA found that the "special conditions and circumstances forming the basis for the variance did not result from the actions of the Applicants." F.F. No. 130; Concl. of Law No. 45.

Our review of the record, however, belies the ZBA's findings. To that end, Applicants' city planning expert testified that the loading area requirement is triggered by the fact that Applicants' proposal exceeds 50,000 square feet, and if the proposal was less than 50,000 square feet, no

loading area would be required. *See* F.F. No. 71; N.T., 11/5/08, at 99–100. Thus, it is apparent that the need for the variance stems from Applicants' desire to construct a building that exceeds 50,000 square feet. Additionally, the subject property can be used in compliance with the Zoning Code as it presently exists, as a single-family residence. Applicants' architect conceded this point. F.F. No. 41; N.T., 11/5/08, at 39. Applicants' desire to expand the use of the subject property in order to maximize profitability is not a sufficient hardship to justify the grant of a variance, even under the relaxed *Hertzberg* standard.

Instructive is our decision in *Yeager*. There, an applicant, who operated a Cadillac dealership on its property, sought dimensional variances from a zoning ordinance's setback requirements so that it could construct a new Land Rover sales and service building and an off-road demonstration course. The zoning board granted the variances based on its determinations that a substantial slope on the property and the size of the lot made the proposed building the only feasible location on the site. The common pleas court disagreed, determining any difficulty in locating the proposed building on the site arose from the applicant's insistence that the building comply with Land Rover's requirements. In so doing, the common pleas court pointed to, among other things, the applicant's acknowledgement that a 5,000 square foot building would fit on the property without the need for a variance, but the applicant did not design a building smaller than 10,000 square feet because Land Rover would not have approved it. Affirming the common pleas court, this Court stated:

> Ever since our Supreme Court decided *Hertzberg*, we have seen a pattern of cases arguing that a variance must be granted from a dimensional requirement that prevents or financially burdens a property owner's ability to employ his property *exactly as he wishes*, so long as the use itself is permitted. *Hertzberg* stands for nothing of the kind. *Hertzberg* articulated the principle that unreasonable economic burden may be considered in determining the presence of unnecessary hardship. It may also have somewhat relaxed the *degree* of hardship that will justify a dimensional variance. However, it did not alter the principle that a substantial burden must attend *all* dimensionally compliant uses of the property, not just the particular use the owner chooses. This well-established principle, unchanged by *Hertzberg*, bears emphasizing in the present case. A variance, whether labeled dimensional or use, is appropriate only where the *property*, not the person, is subject to hardship. In the present case, [the] property is well suited to the purpose for which it is zoned and actually used, a car dealership, which is in no way burdened by the dimensional requirements of the ordinance. [The applicant] has proven nothing more than that adherence to the ordinance imposes a burden on his personal desire to sell vehicles for Land Rover.

*Id.* at 598 (emphasis in original) (citation and quotation omitted).

Here, as in *Yeager*, Applicants' effort to obtain a variance from the loading area requirement stems from their desire to erect a building that exceeds 50,000 square feet. As Applicants' city planning expert acknowledged, if Applicants chose to develop the subject property with a building less than 50,000 square feet, the loading area requirement would not be triggered. Further, the subject property is suited to the purpose for which it was designed, a single-family residence. As in *Yeager*, Applicants have proven nothing more than that adherence to the Zoning Code imposes a burden on their desire to construct a tower greater than 50,000 square feet.

This is not sufficient to constitute unnecessary hardship. *Yeager; see also Ken–Med.* Thus, the ZBA erred in granting the requested variance.

## IV. ZBA's Limitation on the Scope of the Hearings

Objectors contend the ZBA erred in refusing to allow them to present evidence that the zoning refusal L & I issued to Applicants was deficient in that it did not require necessary variances for the project beyond the need for a variance from the loading area requirement. Those variances included: a variance from the front setback requirement (the required setback is approximately 103 feet, and Applicants' proposal contemplates a 67–foot setback); floor area ratio (FAR) (the proposal exceeds the Zoning Code's maximum FAR by approximately 2,000 square feet when the "parking garage" area is included, which Objectors contend, should have been included), and parking lot requirements (which require screening and landscaping along street frontage). As set forth more fully below, Objectors further argue that because no hardship existed with regard to use of the subject property, Applicants could not obtain these required variances.

Objectors maintain the ZBA prevented them from subpoenaing and questioning Jeanne Klinger and Danton Watson, the two L & I officials involved in reviewing the ·project, regarding the errors and omissions in L & I's zoning refusal. Objectors assert the ZBA also precluded them from questioning Applicants' witnesses regarding L & I's omissions. They argue these limitations resulted in an incomplete record before the ZBA, necessitating a remand or reversal. Objectors further contend these limitations constituted a violation of their rights to a fair hearing and due process before the ZBA.

Objectors further assert they were not required to file a petition of appeal to the ZBA in order to raise additional bases for refusal of Applicants' proposal. First, they assert, there is no requirement in the Zoning Code or case law that a protestant file a petition of appeal from an applicant's *zoning refusal* in order to present evidence that the refusal is erroneous. Objectors contend they had the right to present evidence of the inaccuracies in the refusal before the ZBA and to cross-examine witnesses on these issues.

Additionally, Objectors argue it is patently unfair to require a protestant to file administrative appeal from a document he did not receive. Objectors point out the only required notice to a zoning protestant occurs when the property at issue is posted, notifying the public of the time and location of the ZBA hearing. The Zoning Code requires such posting 12 days before the ZBA hearing. Here, Objectors assert, the posting occurred on August 29, 2008, 12 days before the ZBA's first hearing. Thus, the posting occurred about three months after L & I's refusal. As such, it was impossible for Objectors to file a timely appeal from the refusal.

Nevertheless, Objectors argue, even if an appeal petition is required, on August 15, 2008, Concerned Citizens actually attempted to file an appeal petition with the ZBA as a prophylactic measure, but the ZBA Administrator prevented them from doing so when he refused to accept the appeal as untimely. Objectors assert it was improper for the ZBA Administrator to do so because it prevented them from challenging the accuracy of the refusal and presenting competent evidence in support of that argument. However, Objectors argue, the ZBA should have considered their appeal timely because they filed it within 30 days of when they first learned of the zoning refusal in late-July 2008.

Finally, Objectors take issue with the trial court's reasoning that they should have appealed the ZBA Administrator's

rejection of their appeal petition to the trial court. Contrary to this statement, they argue, there was no adverse ZBA decision to appeal from because the ZBA did not issue an order or written decision rejecting their appeal. Rather, the ZBA simply refused to accept the paperwork.

■■ In an administrative proceeding, the essential elements of due process are notice and an opportunity to be heard. *Goslin v. State Bd. of Med.*, 949 A.2d 372 (Pa.Cmwlth.2008). The issue of whether a party received due process must be examined in relation to the particular circumstances of each case. *Bornstein v. City of Connellsville*, 39 A.3d 513 (Pa.Cmwlth. 2012).

■ Notice is the most basic requirement of due process. *Id.* Notice should be reasonably calculated to inform interested parties of the pending action. *Id.* The form of the notice required depends on what is reasonable, considering the interests at stake and the burdens of providing notice. *Id.*

As to the hearing requirement, our Pennsylvania Supreme Court explained:

A 'hearing', if it means anything, … contemplates a fair and impartial proceeding at which competent and relevant evidence may be presented. The nature of a hearing was discussed in a similar context in *Unora v. Glen Alden Coal Co.*, 377 Pa. 7, 104 A.2d 104 (1954), and it was noted that '(i)n law, where a controversy is involved, a hearing intends a judgment bench attended by judges or officials sitting in a judicial capacity, prepared to listen to both sides of the dispute and to consider deeply, reflect broadly, and decide impartially. Studying papers is not a hearing; passing on a report moving across one's desk is not a hearing. The very genius of American jurisprudence shines in the opportunity it affords every litigant to present his case openly, publicly and

untrammeledly.' 377 Pa. at 11, 104 A.2d at 106.

*Appeal of Borough of W. Alexander*, 450 Pa. 453, 460, 301 A.2d 662, 666 (1973).

Our courts recognize that adjudicatory action cannot be validly taken by any tribunal, whether judicial or administrative, except upon a hearing in which each party has the opportunity to know of the claims of his opponent, to hear the evidence introduced against him, to cross-examine witnesses, to introduce evidence on his own behalf and to make argument. *Callahan v. Pa. State Police*, 494 Pa. 461, 431 A.2d 946 (1981); *Balfour Beatty Constr., Inc. v. Dep't of Transp.*, 783 A.2d 901 (Pa. Cmwlth.2001); *Pa. State Athletic Comm'n v. Bratton*, 177 Pa.Super. 598, 112 A.2d 422 (1955); *Byers v. Pa. Pub. Util. Comm'n*, 176 Pa.Super. 620, 109 A.2d 232 (1954).

■ Here, Objectors were not afforded an opportunity to fully present their case before the ZBA. Specifically, the ZBA limited the evidence before it to the "four corners" of L & I's revised zoning refusal, which was issued to Applicants. As set forth above, Objectors assert Applicants' proposal required zoning relief beyond that set forth in L & I's revised refusal. The ZBA precluded Objectors from presenting evidence and cross-examining witnesses on these issues on the ground that Objectors did not appeal L & I's refusal.

The ZBA's position on this issue is unsustainable for both factual and legal reasons. Factually, the ZBA's position on timing is curious. The ZBA expected Objectors to appeal the May 23, 2008 refusal to Applicants within 30 days. On August 14, 2008, however, the reasons for refusal were altered by the Klinger Memorandum. Objectors attempted to appeal the refusal the next day, August 15, 2008, but their papers were declined as untimely by the ZBA Administrator. The ZBA does not explain how the timing of the change in

rationale squares with its conclusion that Objectors are limited in the grounds they may challenge.

Another factual issue is notice to Objectors. Section 5.5–1002(b)(4) of the Philadelphia Home Rule Charter (relating to the functions of L & I), states: "[L & I] shall ... If the application is refused, *notify the applicant in writing* of the refusal and the reasons therefor." 351 Pa.Code § 5–5–1002(b)(4) (emphasis added). Here, although L & I notified Applicants of the refusal of their application, there is no indication when, if at all, Objectors received such notice. *See* R.R. at 79a.

Similarly, the ZBA's regulations require that, when an appeal is taken to the ZBA, notice of the appeal shall be posted by the applicant on the premises for at least 12 consecutive days immediately prior to and including the day of the hearing before the ZBA. R.R. at 556a. Where, as here, L & I issues a zoning refusal, it is doubtful that notice to an objector would be given prior to this posting.

Legally, it is questionable that an objector is required to appeal an L & I zoning *refusal* to the ZBA, given that a zoning refusal is not a result adverse to an objector. *See* Section 1705(1) of the Zoning Code (appeals to ZBA "may be taken by any person *aggrieved by* ... any decision of [L & I]....") (Emphasis added).

We conclude that requiring Objectors here to appeal an unserved zoning refusal is at odds with due process concerns. As such, the ZBA erred in restricting Objectors from presenting evidence outside the "four corners" of the zoning refusal.

Our concern here reflects the Supreme Court's concern in *Narberth Borough v. Lower Merion Township,* 590 Pa. 630, 915 A.2d 626 (2007). There, the Court considered whether a neighboring borough's appeal of a municipality's approval of a land development plan was timely where the borough filed its appeal within 30 days of the municipality's written decision, but more than 30 days after its verbal announcement. The Court held the 30–day appeal period began to run from the mailing of the written decision. A secondary but significant concern expressed by the Supreme Court was the "asymmetry of treatment" of a land use applicant, to whom a written decision must be transmitted, and others, such as objectors, to whom a decision need not be sent. *Id.* at 647, 915 A.2d at 636. The concern was whether non-applicants were at a disadvantage in discerning the time for appeal.

The concern over asymmetrical treatment expressed by our Supreme Court in *Narberth Borough* is present here where *Applicants* were served notice of L & I's refusal of their application, but Objectors were not. Under these circumstances, the ZBA's restriction on Objectors' presentation based on their failure to timely appeal a decision not served on them, is at odds with considerations of fairness and due process.

Our conclusion is also bolstered by our decision in *East Allegheny Community Council v. Zoning Board of Adjustment of City of Pittsburgh,* 128 Pa.Cmwlth. 391, 563 A.2d 945 (1989). There, the applicants applied to the zoning administrator for a permit in order to construct a commercial parking lot in a residential zoning district. The zoning administrator denied the application because the proposed parking lot did not comply with the zoning ordinance's setback requirements. The applicants appealed to the zoning board, seeking dimensional variances from the setback requirements. The objectors to the proposal asserted the zoning board lacked authority to grant dimensional variances because a commercial parking lot was not permitted in the residential zoning district. The applicants responded the objectors did not preserve this issue be-

cause they did not appeal the zoning administrator's denial of the permit to the zoning board.

This Court disagreed. Speaking through Judge McGinley, the Court explained the objectors could not appeal the zoning administrator's permit denial because they were not "aggrieved persons." Thus, we rejected the applicants' argument that, by failing to appeal the zoning administrator's denial of the permit, the objectors did not preserve the issue of whether the zoning board had authority to grant the requested variances.

In his treatise Pennsylvania Zoning Law and Practice, Robert S. Ryan provides the following commentary regarding our decision in *East Allegheny Community Council,* which is noteworthy here:

> [The applicants'] argument would have had serious consequences if it had been accepted. The first notice of the denial of a permit received by protestants usually is the advertisement of the hearing on the [applicant's] appeal. This usually will occur one or two months after the action of the zoning officer which prompts the appeal or application. The advertisement normally gives nothing more than notice of the matters which the [applicant] seeks to bring to the board. *To accept the argument that the protestants must rummage through the file and appeal any action or comment by the zoning officer with which they disagree, whether or not it resulted in the issuance of a permit, would be to grant [applicants] a treasure trove of claims that they are entitled to rights otherwise denied them by the zoning ordinance.*

2 Robert S. Ryan, *Pennsylvania Zoning Law and Practice* § 9.4.3 (revised June 15, 1993) (emphasis added).

Moreover, Applicants' arguments to the contrary do not alter this result. Specifically, Applicants reliance on *In re Chambers (Appeal of Springfield Twp.),* 399 Pa. 53, 159 A.2d 684 (1960), *Barth v. Gorson,* 383 Pa. 611, 119 A.2d 309 (1956), and *Lukens v. Zoning Bd. of Adjustment,* 367 Pa. 608, 80 A.2d 765 (1951), is misplaced. None of these cases can be construed as requiring *an objector* to an application for zoning relief to appeal a zoning officer's *refusal* to grant such relief. Rather, *Chambers* and *Lukens* stand for the proposition that where a zoning ordinance requires *an applicant* for zoning relief to first seek relief before a zoning officer, a zoning board only possesses jurisdiction where an applicant properly invokes the zoning board's jurisdiction by filing an appeal from the initial denial of such relief.

Further, in *Barth,* the Court held that a party challenging the validity of a rezoning ordinance must do so through an appeal to the zoning board rather than through a suit in equity where the zoning ordinance sets forth the required procedure. In short, *Chambers, Barth* and *Lukens* hold that where an ordinance prescribes a procedure to obtain review, a party must adhere to that procedure in order to obtain relief. Contrary to Applicants' contentions, there is simply no indication that Objectors here failed to comply with the procedure prescribed by the Zoning Code.

In further support of their argument that Objectors were required to appeal L & I's initial refusal, Applicants point to certain provisions of the Zoning Code that contain a "One Year Rule," which requires L & I to deny an application for zoning relief that is substantially similar to a previously denied application. *See* Section 1703(6) of the Zoning Code. These provisions state that where L & I fails to deny an application on the basis of the "one year rule," any aggrieved party may challenge L & I's failure to do so in appeal to the ZBA after issuance of a permit, or in an appeal to the ZBA from L & I's *refusal* to

issue a permit for reasons other than application of the "one year rule." Section 1703(6)(e) of the Zoning Code. Applicants assert these provisions would be rendered meaningless if the ZBA already possessed plenary jurisdiction to hear a "one year rule" claim. Further, they assert, under the doctrine of *expressio unius est exclusio alterius*, the ZBA lacked authority to consider Objectors' claims here because the Zoning Code does not generally grant the ZBA plenary jurisdiction, but rather it only does so in the context of the "one year rule" where L & I fails to deny an application on this basis.

Regardless of Applicants' convoluted statutory construction arguments, there is no evidence that Objectors were served notice of L & I's refusal, and, more importantly, Objectors' first opportunity to be heard on the application was at the ZBA hearings. Under these circumstances, the ZBA should have afforded Objectors an opportunity to fully present their defenses. Failure to do so requires a remand for a full hearing at which Objectors can present their defenses in opposition to the application. *See* Section 754(a) of the Local Agency Law, 2 Pa.C.S. § 754(a) ("In the event a full and complete record of the proceedings before the local agency was not made, the court may … remand the proceedings to the agency for the purpose of making a full and complete record or for further disposition in accordance with the order of the court."). *See also* 14-1807(4) of the Zoning Code (same).

Although Objectors assert, in detail, that Applicants' proposal required additional zoning relief beyond that decided by the ZBA, because the ZBA chose to limit the scope of the hearings, its decision does not contain sufficient findings on these additional issues. As such, a remand is necessary to allow the ZBA to analyze these claims.

■ As for Applicants' contentions (and the trial court's determination) that Objectors should have appealed the ZBA Administrator's rejection of its attempted August 2008 appeal as untimely, there is no indication that the ZBA Administrator's action constituted an appealable order from which an appeal could be taken. Rather, it appears the ZBA Administrator simply declined to accept the paperwork. Further, as set forth above, Objectors were not served notice of and were not aggrieved by L & I's refusal in the first instance. Under these circumstances, the applicability of the exhaustion doctrine is uncertain. *Hoke v. Elizabethtown Area Sch. Dist.*, 833 A.2d 304 (Pa.Cmwlth.2003) (doctrine of exhaustion of administrative remedies is intended to prevent premature interruption of the administrative process that would restrict agency's opportunity to develop an adequate factual record, limit the agency in the exercise of its expertise and impede the development of a cohesive body of law in that area). To that end, "where the administrative process has nothing to contribute to the decision of the issue … exhaustion should not be required. Furthermore, exhaustion will not be required when the administrative process is not capable of providing the relief sought." *Texas Keystone Inc. v. Pa. Dep't of Conservation & Natural Res.*, 851 A.2d 228, 234–35 (Pa.Cmwlth.2004) (citations and quotations omitted).

### V. "Unity of Use" Agreement

■ Objectors also argue L & I erred in allowing the entire development to claim the benefit of a "unity of use," which was not applicable to the project because there was clearly no "unity of use" between the two properties included in the proposal: one is an historic architectural library, the Athenaeum, and the other is a proposed luxury residential tower, the subject property. Objectors assert Applicants avoided

several Zoning Code requirements (such as the FAR requirement) by utilizing the combined area of their properties under the "unity of use," even though the concept was not applicable because the subject property and the Athenaeum are not an "integrated unit," and Objectors were not permitted to challenge L & I on this issue.

Objectors argue the "unity of use" concept is found only in a 1991 legal opinion of an Assistant Solicitor for the City of Philadelphia, and it rests expressly on language that no longer exists in the Zoning Code; therefore, the concept is not valid today. If the concept is valid, Objectors contend, it was misapplied here because the concept only governs situations that involve vacant lots, owned by the same owner, and proposed for the same use. Here, they assert, the lots are already developed, owned by different owners and are proposed for different uses.

For their part, the Havilands take issue with the ZBA's decision to allow Applicants to elicit testimony from Jean Klinger regarding the alleged "unity of use" agreement to support Applicants' claim of satisfying the permit requirements because no such agreement was ever produced and no evidence of its terms was ever offered by Applicants.

Here, L & I considered the subject property and the Athenaeum as one lot for zoning purposes based on its so-called "unity of use" interpretation. F.F. No. 22. Based on Klinger's testimony, the ZBA also found that when applicants propose a unity of use for two or more properties, L & I reviews the application with the understanding that the unity of use will take place as described, but L & I does not require a copy of the unity of use agreement until shortly before issuance of the zoning permit. F.F. No. 23. In support of its "unity of use" interpretation, L & I relied on a January 1991 "opinion" authored by an Assistant City Solicitor (So-licitor) to L & I's Chief of Permit Issuance. *See* R.R. at 154a–156a, R.R. at 370a. There are several problems with this approach.

First, there is no indication that the 1991 "unity of use" interpretation has been codified in the Zoning Code. *Cf. Lamar Advantage* (drawing distinction between Pittsburgh's unwritten past practice as to "swap agreements" for reduction of billboards and Philadelphia's written ordinance provisions on same topic). As such, while the 1991 Solicitor's opinion could inform the ZBA in its decisionmaking, it could not bind Objectors in a manner that would prevent them from challenging that opinion or its application here. In short, the ZBA cannot invoke the interpretation in such a manner that insulates it from challenge as it attempted to do here.

Second, the validity of the 1991 Solicitor's opinion is questionable. In the 1991 case, the Solicitor considered whether: "In developing their properties, can separate owners or a consortium of developers who are separate owners of contiguous parcels treat the parcels as one lot for zoning purposes?" R.R. at 154a–55a. There, two entities that owned two contiguous pieces of real estate sought to construct a "fully integrated" office complex with retail space, which consisted of two towers and a parking garage. The parties covenanted to make a single joint application for zoning approval and to designate their parcels as one lot for zoning purposes.

In resolving the issue, the Solicitor noted the Zoning Code's definition of the term "lot" permitted a developer to "designate" (a reference to the developer's subjective intent) what parcel of land would be built on as a unit rather than using objective criteria to define the term. The Solicitor noted the Zoning Code was silent on the terms "parcel," "owner" and "developer," and the Zoning Code stated, "words used

in the singular include the plural." R.R. at 156a. The Solicitor further pointed out, in interpreting the Zoning Code, all doubts should be resolved in favor of the landowner. The Solicitor stated the Zoning Code's definition of the term "lot" permitted the subjective intent of the owner or developer to determine what unit of property would be designated as a lot in the absence of any other Zoning Code provision that prohibited that designation.

The Solicitor also referred to our Supreme Court's decision in *Markey v. Zoning Board of Adjustment,* 409 Pa. 430, 187 A.2d 175 (1963), in which the Court held that a single owner of two parcels could group the parcels together for zoning purposes in order to meet certain area requirements for a proposed convalescent home and accessory parking lot. See *also Fisher Building Permit Case,* 355 Pa. 364, 49 A.2d 626 (1946) (proprietor of several units of land, each in successive juxtaposition to another, may develop them into a single lot and they will be accepted as such in matters involving zoning). Despite the fact that *Markey* was silent on whether the rule could apply to a case involving multiple owners of contiguous lots, the Solicitor determined the same rule could apply based on her construction of the Zoning Code's "lot" definition. In so doing, the Solicitor stated the multiple owners would be required to agree to be bound by recorded easements, agreements, and covenants that clearly limit present and future owners of the parcels to the unity of the use of the lot.

The Solicitor's opinion (that multiple owners of contiguous parcels can enter into recorded agreements to have their parcels considered as a single lot for zoning purposes) is questionable given that the opinion is a significant step beyond that approved by the Supreme Court.

Third, even if the interpretation is viable, its application here is unclear. More particularly, the terms of the "unity of use" agreement between the Turchis and the Athenaeum are unknown. Thus, unlike in the case discussed in the 1991 Solicitor's opinion, here it is not possible to discern whether the proposed development is "fully integrated" or "unified in use." Indeed, there appears to be little if any proposed development on the Athenaeum property, other than a breach in an existing wall, and it is uncertain how the use on the Athenaeum property will change.

Nor is it known whether there are in existence "various record[able] restrictive covenants, easements and/or agreements" that bind future owners of the subject property and the Athenaeum to preserve the unity of use and the legality of the entire project, as required by the City Solicitor's formulation of the rule. See R.R. at 155a, Assistant City Solicitor's Op. at 2. While a delay in actual recording is reasonable, a delay in disclosure of the terms of the "unity of use" agreement is not, especially in light of the apparently limited involvement of the Athenaeum property. Also, agreement of the owners of the Athenaeum property to the terms should be established on the record. Because the ZBA's decision contains no findings on these issues, a remand is needed for findings concerning the specific aspects of the agreement between the Athenaeum and the Turchis.

## VI. Special Use Permit for Accessory "Parking Lot"

As a final issue, the Havilands assert the ZBA erred in determining Applicants met their burden of proof for a special use permit for the proposed accessory parking lot. They argue Applicants did not present competent evidence to satisfy the Zoning Code's requisite criteria for the grant of a special use permit.

As a threshold matter, however, Concerned Citizens contend the ZBA erred in classifying the proposed parking area as a

"parking lot"[4] rather than a "garage"[5] under the Zoning Code because a substantial portion of the parking area would be covered by the proposed building. They argue, if the parking area is classified as a "garage" as opposed to a "parking lot" (as it was in L & I's initial refusal issued prior to the Klinger Memorandum), the Zoning Code requires that it be included in the gross floor area calculation for the subject property. *See* Section 14–305(13)(a)(.1) of the Zoning Code.

Although Objectors attempted to raise the issue of whether Applicants' proposed parking area is appropriately classified as a "garage" both prior to the ZBA hearings through correspondence to Klinger and briefly at the outset of the first hearing, the ZBA did not address this issue. R.R. at 144a, 296a–97a. As discussed more fully above, we believe Objectors should be afforded an opportunity to fully present this issue to the ZBA. As such, we vacate the ZBA's grant of the special use permit for the accessory "parking lot," and we remand for the ZBA to first consider whether any proposed parking area is properly classified as a "parking lot" or a "garage" under the Zoning Code.

Based on the foregoing, we reverse that part of the decision of the trial court pertaining to the variance from loading space requirements, we vacate the other parts of the decision of the trial court which af-

firmed the ZBA, and we remand for further hearings consistent with the foregoing opinion. We leave to the discretion of the trial court to determine whether it receives additional evidence or whether it remands for hearings before the ZBA.

### *ORDER*

**AND NOW,** this 9th day of April, 2012, the order of the Court of Common Pleas of Philadelphia is **REVERSED in part, VACATED in part,** and **REMANDED** for proceedings consistent with the foregoing opinion.

Jurisdiction is relinquished.

---

4.  Section 14–102(87) of the Zoning Code defines "parking lots," in pertinent part, as: "Any outdoor area or space for the parking of motor vehicles, including spaces, aisles and driveways...."

5.  Section 14–102(55) of the Zoning Code defines "garage" as:
    A building or other structure or part thereof used primarily for the housing, parking or storage of motor vehicles, including the following types:
    \* \* \*
    (b) *Private Garage.* A building, structure or part thereof in which more than three (3)

motor vehicles may be parked, stored, housed or kept and which are not used for transient public parking, but which are for the private use of the owners, tenants, customers or visitors of a premises, excluding Private Dwelling Garages....