# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Emilio DiCicco, Vincenzo Ciocca : 
and Antonio Sellecchia : 
 : 
          v. :   No. 2625 C.D. 2015
 :   Submitted: January 6, 2017
City of Philadelphia, : 
Zoning Board of Adjustment : 
 : 
Appeal of: City of Philadelphia : 

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**          **FILED: May 10, 2017**

      In this procedurally complex appeal, the City of Philadelphia (City) asks whether the Court of Common Pleas of Philadelphia County (trial court) erred in reversing a decision of the City of Philadelphia Zoning Board of Adjustment (ZBA) that revoked two zoning/use registration permits (permits) issued to Landowners[1] by the Philadelphia Department of Licenses and Inspections (L&I). The permits authorized the construction of two single-family homes. The ZBA revoked the permits on the ground that the property at issue was a single zoning lot rather than two distinct lots; therefore, Landowners could not construct two homes on the lot. The City contends the trial court erred in reversing the ZBA's decision that upheld L&I's revocation. Further, as a preliminary matter, we consider whether the trial court properly granted the City's petition to appeal *nunc pro tunc*

---

[1] Landowners are Emilio DiCicco, Vincenzo Ciocca and Antonio Sellecchia.

("now for then"). Upon review, we affirm the trial court's order that granted the City's petition to appeal *nunc pro tunc* to this Court, and we reverse the trial court's order on the merits, thereby reinstating the ZBA's decision.

## I. Background
### A. L&I/ZBA Proceedings

The ZBA set forth the following factual findings. On August 1, 2014, Landowners filed two applications for zoning/use registration permits with L&I. Application 553601 proposed a single-family home for 9613 Evans Street, and Application 553606 proposed a single-family home for the adjacent parcel at 9615 Evans Street. In each application, Landowners identified the "current use of building/space" as "vacant lot," although there was, in fact, an existing single-family home that spanned the two purported lots. ZBA Op., Finding of Fact (F.F.) No. 1. L&I issued the requested permits authorizing construction of a single-family home on each of the parcels identified by Landowners on August 6th and 7th 2014.

Approximately a week later, L&I revoked both permits. In a letter to Landowners' counsel, L&I representative Elizabeth Baldwin wrote:

> The permit applications were submitted for the erection of a detached structure for use as a single family dwelling on each lot. The lots were presented as existing and separate. While these lots were described separately by deed and were recently granted separate tax accounts by the Office of Property Assessment [(OPA)], our [z]oning records reflect a single lot built upon as a unit. The zoning record reflects a lot, inclusive of both deeded properties, with one structure used as a single family dwelling since at least 1952. The separation of these lots for zoning purposes requires a permit complying with the

2

provisions for lot adjustments outlined in Section14-304(6) of the Philadelphia Zoning Code [(Zoning Code)].

F.F. No. 3 (quoting letter from Elizabeth Baldwin to Dawn Tancredi, Esq., 8/15/14) (emphasis added).

Landowners appealed the permit revocations to the ZBA. In their appeal, Landowners asserted:

> The two parcels, 9613 and 9615 Evans Street, are separate tax parcels that have never been formally consolidated and are grandfathered as to current requirements for lot size and street frontage. The zoning permits were properly issued for the 'by right' construction of a single family home on each parcel. The permits were improperly revoked by [L&I].

F.F. No. 4 (quoting Application for Appeal, 9/12/14). A hearing on Landowners' appeal ensued before the ZBA.

The property at issue, which is located at 9613-9615 Evans Street (combined property), lies in an RSD-2 residential zoning district. In 1952, then-owners Harry and Marie Keen filed a zoning application with the City for the proposed construction of a 1½-story, single-family home at the combined property, which they described as 105 feet wide and 112 feet deep. Hand-drawn plans attached to the application showed a single, undivided lot with the proposed home located approximately at its center. The City's Bureau of Engineering, Surveys and Zoning issued the permit in August 1952. In 1960, the Keens applied for, and were granted, a second zoning permit that authorized construction of a dormer on the previously approved dwelling at the combined property.

The 1952 application representing the property as a single lot is the earliest zoning document on record for the property. There were no prior or subsequent zoning approvals recognizing 9613 and 9615 as separate zoning lots (with the exception of the revoked permits at issue here).

Applicants purchased the combined property in 2013. It was conveyed to them under a single deed that included separate legal descriptions for the two parcels. The deed identified the property, in its entirety, as 9615 Evans Street. At the time Applicants purchased the combined property, the home approved in 1952 remained standing on the combined property. The property had a single postal address and a single tax account number with the OPA. The home spanning the two parcels was not demolished as of the ZBA's hearing in December 2014.

At the ZBA hearing, Landowners' counsel stated that the two parcels that compose the combined property "became individual and separate back in 1923." F.F. No. 14. Landowners' counsel added:

> That happened pursuant to a survey, a survey plan of what was called Chapel Croft Place. This plan was prepared by a man named Pennock Huey, and that was part of a 200-lot subdivision and development, and there is a copy of that survey included in the packet that I turned in.

Id. (citing ZBA Hr'g, Notes of Testimony (N.T.), 12/17/14, at 4-5). Landowners' counsel further noted the two parcels comprising the combined property were separately deeded in 1952, when the original zoning permit for the property was issued. Landowners' counsel submitted copies of deeds recorded in 1969 and 2013

4

that included both parcels but stated separate legal descriptions for each parcel. Both the 1969 deed and the 2013 deed (which transferred ownership to Landowners) identified the combined property by a single address, 9615 Evans Street.

Landowners' counsel described 9613 and 9615 Evans Street as having separate tax account numbers, but she acknowledged those numbers were assigned recently and a single account number previously covered both parcels. Landowners' counsel argued the two parcels created in 1923 were never formally consolidated and must therefore be treated as individual, nonconforming lots. Landowners' counsel stated: "Our Zoning Code tells us how to adjust lot lines, and no[n]e of the formal requirements were done. And our Zoning Code also identifies nonconforming lots, and this [case] falls right in line with what a nonconforming lot is." F.F. No. 19 (citing N.T. at 33). Landowners' co-counsel added:

> [W]e contend that [the 1952 zoning permit] was illegal because there was no property line shown in the middle of the one property that the applicant filed for because that was an illegal plan. It was a hand sketch. It wasn't sealed. It didn't show an interior property line and no permit should have been issued for that house.

F.F. No. 20 (citing N.T. at 36).

In support of their argument that 9613 and 9615 Evans Street should be treated as individual, nonconforming lots, Landowners presented the testimony of Joseph Beller, Esquire, whom they asked the ZBA to recognize as an expert in zoning. The City objected to Attorney Beller's testimony, stating:

5

> I do not question that [Attorney Beller] has expertise in the Zoning Code, however, I will object for the record to this testimony. Clearly, he has no direct knowledge. He's not a fact witness. And you could bring ten other zoning lawyers into [this] room right now and you will get 12 opinions about this.

F.F. No. 22 (citing N.T. at 37-38). The ZBA allowed Attorney Beller to testify without formally recognizing him as an expert.

Attorney Beller advised the ZBA that he began practicing zoning law in 1962. When asked how "the [Zoning Code] [dealt] with consolidation of separate adjacent properties" at that time, Attorney Beller recalled:

> Well, they called it reverse subdivision … And you went to the zoning section, which in those days was the City Hall Annex, now a Courtyard Marriott. And it was very few personnel, but there was a gentleman in charge, who I remember well, Joseph Rosenberg. You used to present your fact[s] to him, and he would then suggest, in most cases, that you bring him a stamped plan showing a survey stamped by an engineer or some person with a seal, some professional so that they could then determine whether you were within the lot lines that were consistent with the deed and whether you encroached on anybody else or whether anybody else encroached on you, and of course, the measurements so you could then comply.

F.F. at 25 (quoting N.T. at 39-40).

As to the zoning application submitted in 1952, Attorney Beller stated: "None of the legal requirements were met, number one. And number two, if you look at the application, as I have, it didn't ask for [consolidation]. I think it was one of those things that happens. It slipped through somehow and nobody

6

checked it." F.F. No. 26 (quoting N.T. at 51). Attorney Beller opined that L&I erred in revoking the permits at issue here because "if you looked at the deeds from 1923 on, there were always two lots" and, "[i]f there are two lots, you don't have to ask for two lots." F.F. No. 27 (quoting N.T. at 52). While maintaining that 9613 and 9615 Evans Street never became one zoning lot, Attorney Beller acknowledged that the City's "Sanborne" map, which he said "didn't follow the deeds" but "basically followed what zoning did," showed the combined property "from time immemorial as one lot." F.F. No. 28 (quoting N.T. at 43, 48-49) (emphasis added).

For his part, the City's counsel argued that, "deeded properties and zoning parcels are not one and the same. They're not identical, and at times there can be differences depending on how it was created and how it was presented and acted on in an application." F.F. No. 29 (quoting N.T. at 35). The City's counsel stated the City's "position in all these cases, for zoning purposes there's a zoning lot, and that's what they [sic] go b[y]. So when [L&I] is reviewing an application for zoning, they're [sic] looking in their records as to what is the zoning lot and then that's what they [sic] apply." F.F. No. 30 (quoting N.T. at 85). The City's counsel stated he did not dispute the parcels at issue were or had been separately deeded, "but if it becomes a single zoning lot historically, then that's how it is, unless something happens to change that when [L&I] acts on the zoning application." F.F. No. 31 (quoting N.T. at 86).

The City also presented the testimony of Elizabeth Baldwin (Baldwin), Acting Director of L&I's Development Division, to testify regarding

7

the circumstances of the disputed permit revocation and her Department's policies on recognizing zoning lots. Baldwin testified that Landowners' Counsel called her in May 2014 to discuss the property. She described the conversation as follows:

> [Landowners' Counsel] called me to basically state his case, that these are two lots in zoning. I looked up the file and I said: No. The zoning record indicates a single lot. You would either have to consolidate the deeds to comply with the zoning or subdivide in zoning to conform to the deeds. He disagreed with the position. I invited him to submit something in writing to me and I would pass it on to the Law Department, and I didn't hear anything more from him.

F.F. No. 33 (quoting N.T. at 71). Baldwin indicated she first learned that permits were issued for the proposed development when she "received a call from Alice in Councilman [Brian] O'Neill's office asking how we issued these permits." F.F. No. 34 (quoting N.T. at 71). Until that time, Baldwin was unaware that Landowners submitted the applications.

After learning of the permit issuance, Baldwin called Landowners' Counsel and explained she "was going to revoke the permit[s] because this is one zoning lot." F.F. No. 35 (quoting N.T. at 74). At Landowners' Counsel's request, Baldwin waited to hear from Landowners' Counsel before taking further action. After receiving a letter from Landowners' Counsel that "didn't really include anything she didn't already know," Baldwin revoked the permits. Id. Describing the sequence of events, Baldwin stated: "The last permit was issued on August 7th. I called [Landowners' Counsel] either August 8th or August 11th. We met on August 13th and I revoked the [p]ermits on August 15th." F.F. No. 36 (quoting N.T. at 74-75).

8

When questioned regarding her agency's procedures for recognizing zoning lots, Baldwin stated, "prior to the adoption of this [Zoning] Code in 2012 there was no correlation between a deeded lot and a zoning record in the Zoning Code." F.F. No. 37 (quoting N.T. at 75-76). Baldwin stated, in practice, however, her office required conformance between zoning lots and deeds at least since she began working there in 2006. Baldwin added that she did not know how things were handled in 1952, but based on her review of historic records, discrepancies between deeds and zoning lots were "common." F.F. No. 38 (quoting N.T. at 76).

As to the property at issue here, Baldwin testified it was treated as one lot because "it was presented as one lot for zoning purposes when the house was constructed, and it was evaluated as one lot when the building was built." F.F. No. 39 (quoting N.T. at 76). When questioned by Landowners' Counsel as to when the two deeded parcels were consolidated, Baldwin testified: "I can't speak to the deeded descriptions, because they're still identified as two separate deeded lots. For zoning purposes, they were always presented as one zoning lot." F.F. No. 40 (N.T. at 83).

In addition to arguing that the parcels at issue were separate, nonconforming zoning lots, Landowners' Counsel stated, as an independent ground for appeal, that the revoked permits should be deemed valid under a vested rights theory. In support, Landowners' Counsel noted his clients "paid for building plans and also lawyers' fees." F.F. No. 41 (quoting N.T. at 97-98).

The ZBA also set forth the following pertinent conclusions of law. In challenges such as this, there is a presumption that municipal officers perform their duties properly and take the steps necessary to give validity to their official acts. Mamallis v. Borough of Millbourne, 164 A.2d 209 (Pa. 1960); Appeal of Gilbert, 383 A.2d 556 (Pa. Cmwlth. 1978); Twp. of Haverford v. Spica, 328 A.2d 878 (Pa. Cmwlth. 1974). This presumption of official propriety is conclusive if not rebutted by affirmative evidence of irregularity. Mamallis.

In addition, where a challenge involves interpretation of the Zoning Code, the ZBA must give deference to the agency charged with administering the Zoning Code. Turchi v. Phila. Bd. of License & Review, 20 A.3d 586 (Pa. Cmwlth. 2011) (agency's interpretation of statute it is charged to administer is entitled to deference absent fraud, bad faith, abuse of discretion, or clearly arbitrary action).

Here, the ZBA determined Landowners did not establish that L&I erred in revoking the permits. To that end, the record established that L&I recognized the property as a single zoning lot since at least 1952. A zoning application submitted that year included a dimensioned site plan depicting the property as a single, unified parcel. A permit issued pursuant to that application authorized construction of a single-family home that spanned the parcels that Landowners now characterize as individual lots. Additionally, the City's Sanborne map identifies the property as one zoning lot--and has done so, according to Landowners' own witness, Attorney Beller, "for time immemorial." ZBA Op.,

10

Concl. of Law No. 7. Until 2014, the property had a single postal address and a single tax account number.

According to L&I's representative, Baldwin, L&I determined the property was a single zoning lot based on prior zoning applications/permits recognizing it as such. The ZBA found Baldwin's testimony credible and persuasive, and it found the L&I procedures she described to be reasonable and consistent with applicable law. By contrast, the ZBA determined that Landowners' arguments were unsupported by either factual evidence or applicable law.

In particular, Landowners asserted, "in 1952, the established protocol for consolidation of parcels included the preparation of a survey clearly showing proposed extinguishment of existing property lines and a new legal description, approval of [the Philadelphia City Planning Commission (PCPC)], the filing of a zoning application requesting consolidation, obtaining a permit for consolidation and recording a deed of consolidation." ZBA Op., Concl. of Law No. 11 (citing Landowners' Memorandum to ZBA, 12/17/14). The ZBA determined Landowners' representations regarding "established protocol," were not supported by reference to Zoning Code provisions in force during the relevant time period or by any evidence. Id.

In addition, the ZBA found Attorney Beller's testimony regarding lot consolidation requirements to be unpersuasive and inapposite. More particularly, Attorney Beller, who began practicing 10 years after issuance of the 1952 permit recognizing the combined property as a single lot, offered anecdotal evidence

11

recalling that in 1962 the L&I employee who handled lot consolidation applications would "suggest, in most cases, that you bring him a stamped plan showing a survey stamped by an engineer or some person with a seal." Concl. of Law No. 12. However, Attorney Beller did not identify any Zoning Code provision or regulation that mandated conformity between zoning lots and deeded lots or that required submission of a professionally prepared survey plan in 1952.

The ZBA also found the cases cited by Landowners, this Court's decision in Southdown Inc., v. Jackson Township Zoning Hearing Board, 809 A.2d 1059 (Pa. Cmwlth. 2002) and the trial court's decision in Batchelder v. Philadelphia Zoning Board of Adjustment, No. 130702408 (C.P. Phila. July 15, 2014), 2014 WL 4412652, aff'd, (Pa. Cmwlth., No. 945 C.D. 2014, filed June 5, 2015), 2015 WL 5446668 (unreported), were inapposite.

In addition, the ZBA stated, in suggesting the combined property was actually two separate lots, Landowners were effectively challenging the 1952 permit approving the parcels as a single lot, which they could not do more than 60 years later.

Finally, the ZBA rejected Landowners' vested rights argument on the grounds that Landowners: (1) were advised prior to submitting their permit applications that the property at issue would be treated as a single zoning lot; (2) were informed that the permits would be revoked within days of their issuance; and, (3) were notified of the revocations approximately a week later—long prior to the expiration of the 30-day appeal period. Additionally, the ZBA stated, in their

12

permit applications, Landowners did not disclose the existence of the single-family home that spanned the combined property; rather, they described the combined property as "vacant." Concl. of Law No. 20. As a result, the ZBA stated, in addition to the fact that the timing precluded a finding of vested rights, it was arguable that Landowners acted in good faith.

For all these reasons, the ZBA denied Landowners' appeal of L&I's revocation of the permits. Landowners appealed to the trial court.

## B. Trial Court Proceedings

Without taking additional evidence, and based solely on the brief and oral argument of Landowners, the trial court reversed the ZBA's decision on September 2, 2015.

Thereafter, Philadelphia City Councilman Brian J. O'Neill filed a praecipe to intervene and a motion to open the trial court's order reversing the ZBA's decision. He averred he did not receive service or notice of the appeal. Shortly thereafter, Councilman O'Neill withdrew his motion.

On December 8, 2015, the City filed a notice of appeal to this Court. Although the City did not file a separate motion to appeal *nunc pro tunc*, in its notice of appeal, the City argued it was not aware of Landowners' appeal to the trial court because the trial court's case management order listed the incorrect address for the City's solicitor, and all service was made at an improper address. For this reason, the City averred, it did not participate in Landowners' appeal of the ZBA's decision before the trial court. The City also alleged that it was

unaware of Landowners' appeal until it was notified by Councilman O'Neill's office on approximately November 20, 2015.

Ultimately, a single judge of this Court remanded this matter to the trial court for disposition of the City's petition to appeal *nunc pro tunc*, directing the trial court to transmit the original record and its order disposing of the City's petition to appeal *nunc pro tunc* within 60 days.

On remand, the trial court granted the City's petition, allowing it to appeal *nunc pro tunc* to this Court. In a subsequently filed opinion in support of its order, the trial court explained:

> In the instant case, this court heard oral argument and had the benefit of an affidavit from [the City's] counsel that the correct address of [the City] is 1515 Arch Street, 16th Floor, Philadelphia, Pennsylvania, and that the address of 1401 JFK Blvd., 5th Floor, was incorrect, and that [the City's] counsel had informed the Office of Judicial Records of this error on March 20, 2015. Further, [the City's] counsel argued that he had participated in the hearings before the [ZBA] below and that [Landowners'] counsel, an experienced zoning attorney, should have been aware that the address for service was incorrect. This court, as a result, granted [the City's] petition to appeal nunc pro tunc as [the City] had demonstrated that there was a breakdown of this court's operations, a non-negligent reason for the fact that it had not timely appealed and had not participated in the case.
>
> This court cannot address any other alleged errors raised on appeal as, at the time it made its decision, [the City] had not filed a responsive brief or participated in oral argument and they were not part of this court's consideration at that time. Thus, this matter should be remanded for further proceedings including a new

briefing schedule and oral argument on the merits of the appeal.

Tr. Ct., Slip Op., 5/27/16, at 4-5.  This matter is now before us for disposition.

## II. Discussion
## A. Trial Court's Grant of City's *Nunc Pro Tunc* Appeal
### 1. Contentions

As an initial matter, Landowners challenge the trial court's grant of the City's request to appeal the trial court's order to this Court *nunc pro tunc*. Landowners contend the City was properly served with Landowners' appeal of the ZBA's decision at 1401 JFK Boulevard, 5th Floor, Philadelphia, Pennsylvania, 19102, in accordance with the case management order where, in fact, the City Law Department has an office.  Landowners assert there is no legal requirement that the City be served at 1515 Arch Street, 16th Floor.  Even if there was a mistake on the case management order as the City suggests, Landowners argue, the City Law Department has an office at the address listed in the case management order, and the City Law Department accepted service at this address.  Landowners maintain that, aside from the proof of service attached to the appeal, copies of the proof of mailing from the post office were submitted to the trial court, along with a printout that showed the mail was delivered return receipt requested and not returned.

In addition, Landowners contend, Attorney Sharon Suleta entered her appearance on the ZBA's behalf as identified on the docket; thus, the City was aware of the appeal.  Landowners argue the City does not routinely enter an appearance or participate in appeals from the ZBA, so it was not unusual that the City did not participate before the trial court here.

15

Further, Landowners assert, the trial court entered the order at issue here on September 2, 2015. As such, the appeal period expired on October 2, 2015. Landowners point out that the City indicated that Councilman Brian O'Neill made the City aware of this appeal on November 20, 2015. Landowners contend there is no justifiable reason for the City's delay in filing an appeal *nunc pro tunc* on December 8, 2015, more than two months after expiration of the appeal deadline, and more than two weeks after purportedly becoming aware of the order. Landowners assert a change in address for convenience purposes does not equate to an administrative breakdown.

In response, the City argues that a foundational precept of due process is notice and an opportunity to be heard. The City asserts that when Landowners filed their appeal from the ZBA to the trial court, they were obligated to provide notice to the City. The City contends Landowners failed to do so, in part, because of a breakdown in the administrative process in which the trial court inadvertently listed an incorrect address. The City maintains that Landowners' Counsel, experienced zoning attorneys who appear often before the ZBA, also failed to provide notice to the City's Law Department at its long-known location for service, and they failed to serve the City's counsel based on his entry of appearance form completed at the ZBA hearing as the trial court's case management order required. The City asserts that its failure to receive notice of Landowners' appeal was not caused by its own negligence, but rather the actions of Landowners and an administrative breakdown. The City argues it was, therefore, appropriate to permit this appeal *nunc pro tunc* in order for the City to have an opportunity to be heard.

16

For his part, Councilman O'Neill, who filed an *amicus curiae* brief,[2] asserts the trial court did not abuse its discretion in granting a *nunc pro tunc* appeal where, as here, there was an administrative breakdown. In particular, Councilman O'Neill argues there was a breakdown within the administration of the trial court. He contends that, after Landowners appealed the ZBA's decision, the trial court issued a case management order, which for a period of several weeks, set forth the incorrect address on which to serve the City's Law Department. As a result of this error by the trial court administration, Councilman O'Neill maintains, the City did not receive the notice of appeal, was unaware of the briefing schedule and date of oral argument and did not participate in the trial court proceedings. Councilman O'Neill asserts his office learned that the trial court granted Landowners' appeal only after receiving reports from neighbors of the combined property. He contends his office then notified the City, which promptly filed a notice of appeal. As such, Councilman O'Neill argues, the trial court did not abuse its discretion in granting a *nunc pro tunc* appeal in favor of the City.

**2. Analysis**

Fundamentally, due process affords a party notice and an opportunity to be heard. Weaver v. Franklin Cnty., 918 A.2d 194 (Pa. Cmwlth. 2007). "This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." Mullane v. Cent. Hanover Trust Co., 339 U.S. 306, 314 (1950). "An elementary and fundamental requirement of due process in any proceeding which

---

[2] This Court denied Councilman O'Neill's petition to intervene, without prejudice to file a brief as *amicus curiae*.

17

is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Id.

Appeal periods are jurisdictional and may not be extended as a matter of grace or mere indulgence; otherwise, there would be no finality to judicial action. City of Phila. v. Tirrill, 906 A.2d 663 (Pa. Cmwlth. 2006) (en banc). Statutory appeal periods evidence a legislative determination that the finality of court adjudications must be promoted by limiting the time within which they can be questioned on appeal. Id. Thus, an appeal filed one day after the expiration of the statutory appeal period must be dismissed as untimely. Id.

Under extraordinary circumstances, however, a court may extend the appeal period by granting equitable relief in the form of a *nunc pro tunc* appeal. Id. Traditionally, extensions of time for filing an appeal were limited to matters involving fraud or a breakdown in the court's operations. Id. In Bass v. Commonwealth, 401 A.2d 1133 (Pa. 1979), our Supreme Court expanded the limited exceptions permitting this relief where non-negligent circumstances relating to either the appellant or the appellant's counsel caused the untimely appeal. Additionally, an appellant seeking permission to file a *nunc pro tunc* appeal must proceed with reasonable diligence once he knows of the necessity to take action. Tirrill.

Here, the trial court determined the City was entitled to a *nunc pro tunc* appeal of the trial court's order reversing the ZBA's decision. In particular, after this Court's remand for consideration of the City's petition to appeal *nunc pro*

*tunc*, the trial court heard oral argument and received an affidavit from the City's counsel. Ultimately, the trial court granted the City's petition to appeal *nunc pro tunc* based on its determination that Landowners' appeal of the ZBA's decision and the trial court's case management order were not served at the City's correct address; as a result, the City did not have an opportunity to participate in the proceedings on Landowners' appeal before the trial court. No error or abuse of discretion is apparent in this determination.

More specifically, our review of the record reveals that Landowners' notice of appeal of the ZBA's decision to the trial court was served at 1401 JFK Boulevard, 5th Floor, rather than the City Law Department's correct address, 1515 Arch Street, 16th Floor. Certified Record (C.R.), Item #1 (Notice of Appeal). Further, the trial court's case management order was sent to 1401 JFK Boulevard, 5th Floor, rather than the City Law Department's correct address, 1515 Arch Street, 16th Floor. C.R., Affidavit in Support of Petition to Appeal *Nunc Pro Tunc* submitted by Kelly Diffily, Esq., Deputy City Solicitor, City of Philadelphia Law Department; Tr. Ct. Hr'g, Notes of Testimony, 3/17/16, at 6-8.

In addition, at the ZBA hearing, the City's Counsel completed an entry of appearance form that correctly identified the City's address as 1515 Arch Street. C.R., Item #2, (ZBA "Appearance Statement" completed by Andrew Ross, Esq., on behalf of the City). The trial court's case management order required that a copy of that order be served on: "Any person or entity that entered an appearance before the [ZBA] (check the [ZBA's] case file for names)." C.R., Item #6 at Ex. E

19

(emphasis added). Nevertheless, the case management order was not served on the City at the correct address.

As a result, the City was unaware of Landowners' appeal of the ZBA's decision and the trial court's case management order, and it did not participate in the proceedings on Landowners' appeal before the trial court. The trial court determined that the failure to serve the City with the notice of appeal or the case management order at the correct address amounted to a breakdown in the court's operations that warranted *nunc pro tunc* relief. We discern no error or abuse of discretion in that determination. See H.D. v. Pa. Dep't of Pub. Welfare, 751 A.2d 1216, 1220 (Pa. Cmwlth. 2000) ("It has … been held that the administrative officials' failure to properly send a notice constitutes negligence, which amounts to a breakdown in the administrative operation.") (citing Nixon v. Nixon, 198 A. 154 (Pa. 1938); Moore v. Pa. Board of Prob. & Parole, 503 A.2d 1099 (Pa. Cmwlth. 1986)).

Moreover, while Landowners argue that service on the ZBA was sufficient to constitute service on the City, it is clear that the City and the ZBA are distinct entities with different addresses.

And, although Landowners assert the City did not file its *nunc pro tunc* appeal within a reasonable period after learning of the entry of the trial court's order, our review of the hearing on the City's petition to appeal *nunc pro tunc* before the trial court reveals that Landowners did not raise this issue before the trial court. Thus, it is not surprising that the trial court did not address this issue.

20

As such, this issue is waived. See Pa. R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").[3]

For these reasons, we discern no error or abuse of discretion in the trial court's decision that granted the City's *nunc pro tunc* appeal to this Court. Further, because the trial court did not receive additional evidence on the merits of Landowners' appeal, this Court's review is limited to determining whether the ZBA committed an abuse of discretion or an error of law. Soc'y Hill Civic Ass'n v. Phila. Zoning Bd. of Adjustment, 42 A.3d 1178 (Pa. Cmwlth. 2012). As such, and in the interests of judicial economy, rather than remand this matter on the merits to the trial court, we will review the ZBA's decision to determine whether it committed an abuse of discretion or error of law.

**B. Merits**
**1. Contentions**

As to the merits, the City contends, as it asserted before the ZBA, its argument is based on the Zoning Code and its application by the agency charged with interpreting its provisions. The City contends that as Baldwin stated in her letter to Landowners, and in her testimony, the combined property was a single

---

[3] In any event, even if not waived, in its petition to appeal *nunc pro tunc*, the City averred it learned of the trial court's September 2, 2015 order reversing the ZBA's decision on November 20, 2015, when it was notified by Councilman O'Neill's office. Certified Record, City of Philadelphia's Petition for Nunc Pro Tunc Appeal to Commonwealth Court at ¶9. Upon learning of the trial court's order, the City alleged, its counsel reviewed the record to determine what occurred and why the City did not receive proper notice. Id. The City discovered the use of the incorrect address in the trial court's case management order. Id. And, it filed its appeal within 18 days of when it learned of the entry of the trial court's order from Councilman O'Neill's office. Id. Under these circumstances, it appears the City acted with reasonable diligence in seeking an appeal *nunc pro tunc*.

21

zoning lot in L&I's records and had been since at least 1952. Though including two legal descriptions, the City maintains, the combined property was conveyed under one deed and treated as one property. The prior owners applied for a single permit to construct a single home on the combined property, which remains in place (despite Landowners' description on the permit applications as two vacant lots). The City further argues that application of the Zoning Code to the combined property by the City officials charged with interpreting its provisions is entitled to deference, and may not be reversed unless clearly erroneous. Thus, the City maintains, the ZBA properly upheld L&I's decision revoking the permits here which permitted the construction of two single-family homes on the combined property.

For his part, Councilman O'Neill asserts this case has a "long and devious history." *Amicus Curiae* Br. on Behalf of the Honorable Brian J. O'Neill at 16. He argues that in 2013, Landowners sought to demolish a single-family home located in the center of the lot located at 9615 Evans Street. In its place, Landowners proposed to split the lot and construct two homes. Councilman O'Neill contends the property at 9615 Evans Street is 100 feet wide; the two proposed homes would be on 50-foot wide lots. As such, variance relief would be required.

Councilman O'Neill further asserts Landowners initially applied for a permit to subdivide the property, and L&I denied the permit. He maintains Landowners appealed to the ZBA, seeking variances to permit two 50-foot wide lots. When Councilman O'Neill's representative and several neighbors appeared at

the hearing to oppose the variances, Landowners' Counsel announced that the appeal would be withdrawn. Landowners then formally withdrew the appeal. By withdrawing the appeal, Councilman O'Neill contends, Landowners conceded their requested variances would be denied on the merits. He asserts that Landowners are now trying to circumvent the zoning process.

First, Councilman O'Neill argues, Landowners contacted the OPA and obtained separate tax accounts for 9615 Evans Street and a newly created address of 9613 Evans Street. He contends the issuance of a new tax account gave the illusion of a subdivision; however, the property was never subdivided through the legal process.

Councilman O'Neill further argues that on separate days, Landowners filed separate applications for separate building permits with L&I for 9613 and 9615 Evans Street, which were initially granted. Councilman O'Neill asserts he inquired about the permit issuance with L&I, which, after consulting with the Law Department, revoked the permits. Landowners then filed a new appeal with the ZBA. Instead of seeking a variance, they sought the equivalent of a declaratory judgment that they were entitled to build two homes as a matter of right. Because there was no evidence in the City's records that the property was ever subdivided, Councilman O'Neill contends, Landowners submitted a 1923 survey plan by a developer to support their allegation of separate lots. Because this survey plan predated the City's first zoning code enacted in 1933, Councilman O'Neill points out, Landowners suggested the property was a nonconforming lot. Under this theory, Landowners erroneously suggested they could demolish the existing home

and build by right. In support, Landowners presented the testimony of Beller, which the ZBA rejected in favor of Baldwin's testimony.

In short, Councilman O'Neill argues, the ZBA did not believe the facts as alleged by Landowners. Further, the ZBA determined as a matter of law that the procedures L&I utilized were reasonable and consistent with the law. Councilman O'Neill asserts there are no factual bases to support any legal determinations other than those reached by the ZBA. As such, he contends, this Court should reverse the trial court's merits order and affirm the ZBA's decision.

In response, Landowners incorporate by reference their brief to the trial court. In particular, they assert the City improperly relied on a 1952 handwritten, unofficial site plan in L&I's files that showed the two parcels as one parcel without an approved survey. Landowners further maintain the City did not show proper extinguishment of the existing property line between 9613 and 9615 Evans Street. Landowners argue the City wrongly asserted the two separate properties achieved legal consolidation status, and, despite no legal consolidation before or after 1952, a subdivision of the two lots was required to effectuate the plans Landowners submitted with their zoning applications. Landowners assert the City made this argument despite the fact that in 1952 the applicant acquired two separate lots by separate deeds.

Landowners maintain the decisions of L&I and the ZBA were not based on any applicable Zoning Code provision. Despite the fact that none of the required formalities for consolidation occurred for the properties, Landowners

24

contend, the City improperly treated the properties as a consolidated lot, and it improperly revoked the legally issued zoning permits.

In reply, the City argues the most salient finding by the ZBA is that the 1952 zoning permit application "representing the [p]roperty as a single lot is the earliest zoning document on record for the [p]roperty." ZBA Op., Finding of Fact (F.F.) No. 10. Indeed, the City asserts, Landowners omit the most important facts here, which show the manifest intent of the prior owners to treat the property as unified and single for zoning purposes. First, in 1952, then-owners Harry and Marie Keen filed a single zoning application to construct a single home on the property. The plan submitted with the application showed "a single, undivided lot with the proposed home located approximately at its center." F.F. No. 7. Additionally, the Keens built that home across the undivided lot, and it remained in place until and after the sale of the property to Landowners in 2013. R.R. at 173a-187a.

In applying for the permits here, the City argues, Landowners falsely, though tellingly, described the property as "vacant," although the home approved in 1952 remains standing – straddling across the lots – to this day. Id. The City further argues that filing for separate tax parcel numbers, which Landowners requested just as they were applying for zoning permits, has no bearing on this matter. The City asserts the property was a single tax parcel for decades. More importantly, a tax parcel is not synonymous with a zoning lot, and obtaining a second tax parcel number does not divide or change the lot for zoning purposes.

25

Further, the City maintains, Landowners discuss the law based on the assumption that the property has always been two separate, individual zoning lots. However, the City argues, that premise is incorrect. To that end, L&I's zoning records, and the ZBA's factual findings, correctly determined the property is a single zoning lot. In any event, the City contends, the prior owners here took overt, unequivocal physical steps that manifested their intent to integrate the adjoining lots and build on the property as a unit.

## 2. Analysis

As fact-finder, the ZBA is the sole judge of the credibility and weight of the evidence presented. Tri-County Landfill, Inc. v. Pine Twp. Zoning Hearing Bd., 83 A.3d 488 (Pa. Cmwlth. 2014). As a result, the ZBA is free to reject even uncontradicted evidence that it finds lacking in credibility. Id. Our review of the ZBA's factual findings is limited to determining whether the ZBA's findings of fact are supported by substantial evidence. Id.

Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Oasis v. Zoning Hearing Bd. of S. Annville Twp., 94 A.3d 457 (Pa. Cmwlth. 2014). When performing a substantial evidence analysis, courts must view the evidence in the light most favorable to the party who prevailed before the fact-finder. In re McGlynn, 974 A.2d 525 (Pa. Cmwlth. 2009). It is irrelevant whether the record contains evidence to support findings other than those made by the fact finder; the critical inquiry is whether there is evidence to support the findings actually made. Keslosky v. Old Forge Civil Serv. Comm'n, 73 A.3d 665 (Pa. Cmwlth. 2013). If there is, an appellate court may not disturb the findings. Id.

Here, in disposing of the issues raised in Landowners' appeal of the permit revocations, the ZBA made the following pertinent findings of fact and conclusions of law (with emphasis added):

## FINDINGS OF FACT

1. On approximately August 1, 2014, [Landowners] submitted two applications for zoning/use registration permits to L&I. Application 553601 proposed a single family dwelling for 9613 Evans Street; application 553606 proposed a single family dwelling for the adjacent parcel at 9615 Evans Street. In each application, [Landowners] identified the 'current use of building/space' as 'vacant lot,' although there was, in fact, an existing single family home spanning the two lots. *See* Application for Zoning/Use Registration Permit[.]

2. L&I issued the requested permits authorizing construction of a single family home on each of the identified parcels on August 6, 2014, (9613 Evans Street) and August 7, 2014 (9615 Evans Street).

3. L&I revoked both permits on August 15, 2014. In a letter to [Landowners] attorney, L&I Representative Elizabeth Baldwin wrote:

> The permit applications were submitted for the erection of a detached structure for use as a single family dwelling on each lot. The lots were presented as existing and separate. While these lots were described separately by deed and were recently granted separate tax accounts by the [OPA], our [z]oning records reflect a single lot built upon as a unit. The zoning record reflects a lot, inclusive of both deeded properties, with one structure used as a single family dwelling since at least 1952.
>
> The separation of these lots for zoning purposes requires a permit complying with the

27

provisions for lot adjustments outlined in Section14-304(6) of the [Zoning Code].

*See* Letter from Elizabeth Baldwin to Dawn Tancredi, Esquire, dated 8/15/2014.

* * * *

7. In 1952, then property owners Harry and Marie Keen filed a zoning application with the City for the proposed construction of a 1 ½ story, single family dwelling at the combined property, which they described as being 105 feet wide and 112 feet deep. Hand drawn plans attached to the application showed a single, undivided lot with the proposed home located approximately at its center. *See* Application 53371B.

8. The requested permit was issued by the City's 'Bureau of Engineering, Surveys and Zoning' on August 12, 1952. *See* Application 53371B.

9. In 1960, the Keens applied for, and were granted, a second zoning permit authorizing erection of a dormer on the previously approved dwelling at 9615 Evans Street (the combined property[)]. [*See*] Application No. 77111F.

10. The 1952 application representing the Property as a single lot is the earliest zoning document on record for the Property. There were no prior or subsequent zoning approvals recognizing 9613 and 9615 as separate zoning lots (excepting the revoked permits at issue here).

11. [Landowners] purchased the combined property in 2013. It was conveyed to them under a single deed that included separate legal descriptions for the two parcels. The deed identified the Property, in its entirety, as 9615 Evans Street. *See* Deed, dated 4/24/2013, at Applicant's Exhibit 7.

12. At the point [Landowners] purchased the combined property, the home approved in 1952 remained standing

28

at the site.  The Property had a single postal address and a single tax account number with the [OPA]. *See* Deed at Ex. 7; 12/17/2014 N.T. at 11-13, 20.

13. The home spanning the two parcels comprising [9615] Evans Street had not been demolished as of the December 17, 2014, zoning hearing.  *See* Date stamped photos of Property.

* * * *

32. [The City] called Elizabeth Baldwin, Acting Director of L&I's Development Division, to testify regarding the circumstances of the disputed permit revocation and her Department'[s] policies on recognizing zoning lots.

33. Ms. Baldwin testified that [Landowners'] attorney, Mr. Schwartz, had called her in May 2014 to discuss the Property. She described the conversation as follows:

> Mr. Schwartz called me to basically state his case, that these are two lots in zoning.  I looked up the file and I said: No. The zoning record indicates a single lot.  You would either have to consolidate the deeds to comply with the zoning or subdivide in zoning to conform to the deeds.  He disagreed with the position. I invited him to submit something in writing to me and I would pass it on to the Law Department, and I didn't hear anything more from him.

12/17/2014 N.T. at 71.

34. Ms. Baldwin said she first learned permits had been issued for the proposed development when she 'received a call from Alice in Councilman O'Neill's office asking how we issued these permits.'  Until that point, she was unaware that applications had been submitted. 12/17/2014 N.T. at 71.

35. After learning of the permit issuance, Ms. Baldwin called [Landowners' Counsel] and explained that she 'was going to revoke the permit because this is one

29

zoning lot.' She then, at [Landowners' Counsel's] request, waited to hear from [Landowners' Counsel] before taking further action. After receiving a letter from him that 'didn't really include anything she didn't already know,' Ms. Baldwin revoked the permits. 12/17/2014 N.T. at 74.

36. Describing the sequence of events, Ms. Baldwin said: The last permit was issued on August 7th. I called [Landowners' Counsel] either August 8th or August 11th. We met on August 13th and I revoked the Permits on August 15th.

12/17/2014 N.T. at 74-75.

## CONCLUSIONS OF LAW

1. [Landowners] contend that [L&I] erred in revoking individual permits issued for 9613 and 9615 Evans Street authorizing the construction of one single family dwelling on each parcel.

\* \* \* \*

6. [Landowners] here have not established that L&I erred in revoking the disputed permits.

7. The evidence of record establishes that [L&I] has recognized the Property as a single zoning lot since at least 1952. A zoning application submitted that year included a dimensioned site plan depicting the Property as a single, unified parcel. A permit issued pursuant to that application authorized construction of a single family dwelling spanning the parcels [Landowners] characterize as individual lots. Additionally, the City's [Sanborne] map identifies the Property as one zoning lot -- and has done so, according to [Landowners'] witness, Mr. Beller, 'for time immemorial.' Until 2014, the Property had a single postal address and a single tax account number.

8. According to L&I representative Elizabeth Baldwin, [L&I] determined that the Property was a single zoning

30

lot based on prior zoning applications/permits recognizing it as such.

9. The [ZBA] found Ms. Baldwin's testimony to be credible and persuasive and the [L&I] procedures she described to be reasonable and consistent with applicable law.

10. By contrast, the [ZBA] finds [Landowners'] arguments to be unsupported by either factual evidence or applicable law.

11. [Landowners] contend that 'in 1952, the established protocol for consolidation of parcels included the preparation of a survey clearly showing proposed extinguishment of existing property lines and a new legal description, approval of PCPC, the filing of a zoning application requesting consolidation, obtaining a permit for consolidation and recording a deed of consolidation.' Applicant's Memorandum to ZBA, dated 12/17/2014, at p. 8. Their representations regarding 'established protocol,' are not, however, supported by reference to [Zoning] Code provisions in force during the relevant time period or, indeed, by any evidence whatsoever.

12. The [ZBA] finds Mr. Beller's testimony regarding lot consolidation requirements to be unpersuasive and inapposite. Mr. Beller, who began practicing ten years after issuance of the 1952 permit recognizing the combined property as a single lot, offered anecdotal evidence recalling that in 1962 the L&I employee who handled lot consolidation applications would 'suggest, in most cases, that you bring him a stamped plan showing a survey stamped by an engineer or some person with a seal.' Mr. Beller did not identify any [Zoning] [C]ode provision or regulation that mandated conformity between zoning lots and deeded lots or required submission of a professionally prepared survey plan in 1952.

13. The [ZBA] likewise finds the cases cited by [Landowners] to be inapposite.

14. In *Southdown Inc., v. Jackson Township Zoning Hearing Board*, 809 A.2d 1059 (Pa. Cmwlth. 2002), the owner of a property used as a limestone quarrying business since 1907 argued that it should be permitted to expand the nonconforming use onto two adjacent parcels that had been 'used for mining purposes for years.' In rejecting the property owner's argument, the court noted that the adjacent parcels, in addition to being separately deeded, had different zoning classifications and had been acquired in separate transactions that had not occurred until 1995. The court additionally relied upon a provision of the Jackson Township Zoning Ordinance that defined a lot as 'a designated parcel, tract, or area of land established by a plot or otherwise as permitted by law and to be used, developed or built upon as a unit.'

15. The circumstances at issue here are distinguishable from those presented in *Southdown* in the respects:

> a. The parcels at issue here were acquired in a single transaction both by the existing owners and the prior owners;
>
> b. The parcels at issue here were recognized and approved by L&I as a single zoning lot to be developed as a unit … as far back as 1952; and
>
> c. The [Zoning Code] defines a 'lot' as 'a parcel of land consisting of a horizontal plane bounded by vertical planes that comprise its front, side, and rear lot lines, and that is intended or designed to be used, developed or built upon as a unit.' [Zoning] Code at §14-203 (169). This differs significantly from the Jackson Township Ordinance definition examined in [*Southdown*]. Applicants have no[t] presented evidence showing a more restrictive definition to have been in effect in Philadelphia in 1952.

16. The second case relied on by [Landowners], [*Batchelder*], is likewise distinguishable. There, the Court of Common Pleas rejected a neighbor's contention that adjacent parcels had merged through common usage

32

and could no longer be treated as separate lots for zoning purposes.

17. The adjacent parcels the neighbors in [*Batchelder*] characterized as a single, merged lot had previously been recognized as individual lots for zoning purposes. The court, in rejecting the neighbors' merger argument, therefore found the properties' historic zoning approvals to be determinative of what constituted a lot. Here, the historic zoning approvals – i.e[.], the 1952 and 1960 permits – recognize the two parcels at issue as a single zoning lot. [Landowners] have presented no evidence of the parcels having been approved as separate lots in any prior or subsequent zoning permit, save for the revoked at issue here. The [*Batchelder*] decision therefore supports a finding that [9613] and [9615] Evans [Street] are a single, unified zoning and that [L&I] acted properly in relying upon the historic zoning approvals.

18. With regard to the lot issue, the [ZBA] additionally notes that [Landowners], suggesting that [9613] and [9615] Evans [Street] are separate lots, are effectively challenging the 1952 permit approving the parcels as a single zoning lot. At the zoning hearing, both Mr. Beller and Mr. Schwartz, argued that the 1952 permit should not have been issued. Putting aside the merits of their argument, the time for appealing the 1952 permit has long since passed. [Landowners'] argument must therefore fail even if they are right in contending that [L&I] failed to follow 'established protocol' in issuing the 1952 permit.

19. The [ZBA] finally rejects [Landowners'] 'vested rights' argument.'

20. [Landowners] here (1) were advised prior to submitting their applications that the parcels at issue would be treated as a single zoning lot; (2) were informed that the permits would be revoked within days of their issuance; and (3) were notified of the revocation approximately one week later - long prior to expiration of the thirty day appeal period. [Landowners] additionally failed to disclose in the submitted applications that an

33

existing single family home spanned the two parcels, instead describing the parcels as 'vacant.' As a result, in addition to the timing issues precluding a finding of vested rights, it is arguable that [Landowners] [acted in] good faith.

F.F. Nos. 1-3, 7-13, 32-36; Concls. of Law Nos. 1, 6-20. Our review of the record discloses ample support for the ZBA's findings. C.R., Applications for Zoning/Use Registration Permit Nos. 553601, 553606; Zoning/Use Permit Nos. 553601, 553606; Permit Revocation Letter 8/15/14 (Baldwin to Tancredi); Deed dated 4/24/13, N.T. at 11-13, 20-26, 39, 43, 71, 74-79, 82-83; R.R. at 173a-187a, 189a-190a. As such, we may not disturb them. Keslosky.

In turn, these findings support the ZBA's ultimate determination that in 1952 Landowners' predecessors applied for and received zoning approval to construct a single-family home on the combined property in a location that straddles what Landowners now claim is the line that divides the combined property. Indeed, when Landowners purchased the combined property in 2013, it was conveyed to them under a single deed that identified the combined property, in its entirety, as 9615 Evans Street (albeit with separate legal descriptions), as was the case with Landowners' predecessors-in-interest. F.F. Nos. 11, 17 (citing Applicants' Exs. 6, 7, Deed, 9/24/69, Deed, 4/24/13).[4] Under these circumstances,

---

[4] As the ZBA properly recognized, this fact distinguishes this case from Southdown Inc., v. Jackson Township Zoning Hearing Board, 809 A.2d 1059 (Pa. Cmwlth. 2002) in which this Court determined that the three parcels the landowner claimed constituted one lot were, in fact, three separate lots where, among other things, the landowner acquired the parcels under separate deeds. Additionally, as the ZBA recognized, the Zoning Code's definition of the term "lot" differs from the definition of "lot" at issue in Southdown. Further, unlike in Southdown, the parcels at issue here were recognized and approved as a single zoning lot to be developed as a unit over 60 years ago.

no error is apparent in the ZBA's conclusion that L&I acted properly in revoking the permits issued to Landowners that would allow construction of two single-family homes on the single, combined property.[5]

Nevertheless, Landowners assert 9613 and 9615 Evans Street should be "grandfathered in" as two lots based on a 1923 survey plan by a developer that depicted the combined property as two lots, and which predates the enactment of the Zoning Code as well as a subsequent 2004 amendment that rendered the lots undersized. Contrary to this assertion, which is based entirely on Landowners' version of the facts, Landowners did not persuade the fact-finder on this issue. To that end, Landowners presented no evidence that the combined property was, in fact, ever used or developed as two separate parcels prior to enactment of the Zoning Code or an amendment that rendered the purported lots undersized. Further, as explained above, the ZBA determined the earliest zoning record for the combined property was the 1952 zoning application, which permitted construction of one single-family home that straddled the purported property line for the two parcels. F.F. Nos. 7, 8, 10; Concl. of Law Nos. 7-9. And, the combined property was consistently used as a single lot for zoning purposes as evidenced by the fact that the single-family home approved in 1952 was still standing when Landowners purchased the combined property and at the time of the ZBA hearing. F.F. Nos. 12-13.

---

[5] Based on the ZBA's supported determinations that the only zoning records pertaining to the combined property show it was approved and used as one lot for one single-family home, we need not address Landowners' argument that the ZBA improperly determined that what Landowners claim are the two parcels that comprise the combined property merged to form one lot. Indeed, the ZBA did not rely on the merger doctrine here.

35

In addition, Landowners take issue with the statement in L&I's letter revoking the permits, which indicated that if Landowners wished to utilize the combined property as two lots they would be required to comply with Section 14-304(6) of the Zoning Code by obtaining approval for two lots (relating to "Lot Adjustments"). Landowners assert this statement disregards the fact that the two lots that comprise the combined property were never formally consolidated and, therefore, L&I could not require subdivision of the combined property. Contrary to Landowners' assertion, and as discussed above, the ZBA's supported determinations indicate that the combined property is, in fact, one lot and, according to zoning records has only been used as one lot; therefore, use of the combined property for two lots would require subdivision as indicated by L&I.

Further, although Landowners also assert L&I lacked authority to approve relocation of the lot lines in order to create a consolidation of what Landowners claim are two lots on L&I's own motion, this is not what occurred here. Indeed, as set forth above, the ZBA's supported determinations reveal that in 1952 the property owners applied for and received approval to utilize the combined property as a single zoning lot through construction of a single-family home located at approximately the center of the combined property. The property has been used for that purpose ever since the 1952 approval was granted. Thus, L&I did not authorize consolidation of the combined property on its own motion.

Nevertheless, Landowners maintain the consolidation of the combined property in 1952 did not comply with the applicable Zoning Code provisions. In support, they rely primarily on the testimony of Attorney Beller, who explained

36

that the 1952 zoning application did not comply with the requirements for lot consolidation. However, as indicated in the excerpted findings and conclusions set forth above, the ZBA expressly rejected Attorney Beller's testimony on this point because, among other things, Attorney Beller did not begin practicing law until 10 years after the approval of the 1952 zoning application and, therefore, could offer no direct testimony on this issue. Concl. of Law No. 12; see also Concl. of Law No. 11.

In addition, while Landowners argue L&I improperly issued the 1952 zoning permit to allow construction of the single-family home on the combined property, as the ZBA determined, "the time for appealing the 1952 permit has long since passed. [Landowners'] argument must therefore fail even if they are right in contending that [L&I] failed to follow 'established protocol' in issuing the 1952 permit." Concl. of Law No. 18. In short, Landowners cannot challenge the previously unappealed grant of the 1952 zoning permit more than 60 years after its issuance.

Finally, as the ZBA properly concluded, Landowners' "vested rights" argument also fails. Our Supreme Court holds that five factors must be weighed in determining whether a party acquired vested rights as a result of permits issued by the government. Petrosky v. Zoning Hearing Bd. of U. Chichester Twp., Delaware Cnty., 402 A.2d 1385 (Pa. 1979). These factors are: (1) his due diligence in attempting to comply with the law; (2) his good faith throughout the proceedings; (3) the expenditure of substantial unrecoverable funds; (4) the expiration without appeal of the period during which an appeal could have been taken from the

issuance of the permit; and, (5) the insufficiency of the evidence to prove that individual property rights or the public health, safety or welfare would be adversely affected by the use of the permit. Id.

Here, as the ZBA correctly determined, the 30-day period in which to appeal the issuance of the permits had not expired at the time of the revocations. Indeed, Landowners were: (1) advised prior to submitting their permit applications that the combined property would be treated as one zoning lot; (2) informed that the permits would be revoked within days of their issuance; and, (3) notified of the revocation of the permits about a week later, well prior to expiration of the 30-day appeal period. Concl. of Law No. 20. Additionally, the ZBA found, in their filed permit applications, Landowners did not disclose that the existing single-family home spanned the combined property, instead describing the parcels as "vacant lot[s]." Id. As a result, as the ZBA properly determined "in addition to the timing issues precluding a finding of vested rights, it is arguable that [Landowners] did not act in good faith." Id. No error is apparent in the ZBA's rejection of Landowners' vested rights argument.

### III. Conclusion

For all the foregoing reasons, we affirm the trial court's grant of the City's petition to appeal *nunc pro tunc* to this Court, and we reverse the trial court's order that reversed the ZBA's decision upholding revocation of the zoning permits.

_____

ROBERT SIMPSON, Judge

Judge Cohn Jubelirer did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Emilio DiCicco, Vincenzo Ciocca and Antonio Sellecchia | : : : | |
| v. | : : | No. 2625 C.D. 2015 |
| City of Philadelphia, Zoning Board of Adjustment | : : : | |
| Appeal of: City of Philadelphia | : | |

# **O R D E R**

**AND NOW**, this 10th day of May, 2017, the order of the Court of Common Pleas of Philadelphia County dated March 17, 2016 and docketed March 22, 2016 is **AFFIRMED**. The order of the Court of Common Pleas of Philadelphia County dated and docketed September 2, 2015 is **REVERSED**.

ROBERT SIMPSON, Judge