# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stephen Pascal and Chris Gates,    :
                 Appellants    :
                                                  :

                 v.                           :
                                                  :

City of Pittsburgh Zoning Board of    :
Adjustment, and City of Pittsburgh    :   No. 496 C.D. 2019
and Northside Leadership Conference   :   Argued: October 3, 2019


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                            FILED: February 28, 2020


Stephen Pascal and Chris Gates (collectively, Objectors) appeal from the Allegheny County Common Pleas Court's (trial court) March 27, 2019 order affirming the City of Pittsburgh (Pittsburgh) Zoning Board of Adjustment's (ZBA) decision and dismissing Objectors' appeal. Objectors present 8 issues for this Court's review: whether the trial court erred by (1) affirming the ZBA's grant of zoning relief when the ZBA failed to issue a written decision within 45 days of the public hearing and Northside Leadership Conference (Applicant) did not agree in writing or on the record to an extension of time within the 45 days; (2) affirming the ZBA's grant of zoning relief where one of the ZBA members had an actual or apparent conflict of interest in Applicant's application and failed to recuse herself; (3) affirming the ZBA's grant of a variance allowing a floor area ratio (FAR) of 2.66:1; (4) affirming the ZBA's grant of a variance permitting zero off-street loading space; (5) affirming the ZBA's grant of a special exception permitting a restaurant use in the local

neighborhood commercial zoning district (LNC district); (6) affirming the ZBA's grant of a special exception permitting off-site parking; (7) affirming the ZBA's grant of a special exception permitting a 5.61-foot rear setback of a property within 50 feet of a residential, very high-density zoning district (RIA-VH district); and (8) affirming the ZBA's grant of zoning relief where, even with the relief requested, the proposed development would not comply with zoning requirements.[1]  After review, we affirm.

Applicant, a non-profit community development corporation, owns 4 parcels of property located at 404-410 East Ohio Street between Cedar Avenue and East Ohio Street in an LNC district in the East Allegheny neighborhood of Pittsburgh (Property).  The Property contains 3 attached, 3-story commercial buildings forming a single structure in significant deteriorating condition.  Applicant seeks to upgrade the structure with interior renovations and a rear addition to create 6 new dwelling units.  Applicant plans to maintain the Property's retail use of the first floor and the restaurant use of the first and second floors, and to increase the number of apartment units on the second and third floors from 2 to 8.  In addition, Applicant intends to demolish and rebuild the existing rear portion of the second floor and add a rear portion to the third floor.  Both the rebuilt portion of the second floor and the new portion of the third floor will be entirely within the existing rear wall line of the first floor and the roofline of the existing third floor.  Applicant proposes to use a 313-square-foot area at the rear (Residential Strip), with access from Moravian Way, as a secondary ingress/egress point for tenants.  This area will also be used for deliveries and garbage removal.  The garage walls will be affixed to the adjoining residential property and the Moravian Way access will be gated.

On March 20, 2018, Applicant applied to the ZBA for: a variance for the proposed 2.66:1 FAR; approval of the restaurant use as a special exception; approval

---

[1] This Court has changed the order of Objectors' arguments for ease of discussion.

of a special exception for off-site parking for the 6 parking spaces mandated for the new apartments; a variance from the off-street loading space requirement; and a special exception waiving the residential compatibility standards for rear-yard setbacks. The ZBA held a hearing on April 12, 2018. On August 23, 2018, the ZBA granted Applicant's requested relief subject to the following conditions: (1) that the 5.6 foot residential/historic district area to be consolidated into the Property be finally approved and recorded; (2) that the lease for the 6 off-site parking spaces be recorded, and that said parking spaces be identified as reserved for the Property's tenants; and (3) that the Historic Review Commission review the Applicant's Residential Strip proposal. On September 21, 2018, Objectors appealed from the ZBA's decision to the trial court. On March 27, 2019, the trial court affirmed the ZBA's decision and dismissed Objectors' appeal. Objectors appealed to this Court.[2]

Objectors first argue that the trial court erred by affirming the ZBA's grant of zoning relief because the ZBA failed to issue a written decision within 45 days of the public hearing, and Applicant did not agree in writing or on the record to an extension of time within the 45 days.[3] The ZBA rejoins that because the 45 days did not start until the record closed, and the record did not close until the ZBA received the requested proposed findings of fact and conclusions of law, and Applicant agreed to all continuances thereafter, the ZBA's decision was timely.

---

[2] Where the parties present no additional evidence, "our review is limited to determining whether the ZBA committed an abuse of discretion or an error of law." *Soc'y Hill Civic Ass'n v. Phila. Zoning Bd. of Adjustment*, 42 A.3d 1178, 1185 n.2 (Pa. Cmwlth. 2012).

[3] Objectors cite *Wistuk v. Lower Mt. Bethel Township Zoning Hearing Board*, 925 A.2d 768 (Pa. 2007), *Humble Oil & Refining Co. v. Borough of East Lansdowne*, 227 A.2d 664 (Pa. 1967), and *Borough of Monroeville v. Foltz*, 290 A.2d 269 (Pa. Cmwlth. 1976), to support their position. However, those cases implicate the Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202, which does not apply to Pittsburgh, *see Allegheny W. Civic Council, Inc. v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 94 A.3d 450 (Pa. Cmwlth. 2014), and concern deemed *approvals*, as opposed to deemed *denials*. Consequently, Objectors' cases are inapposite.

3

Section 922.07.C of the Pittsburgh Zoning Code (Code) provides, in relevant part:

> The [ZBA] shall hold a public hearing on the Special Exception application. After the public hearing, the [ZBA] shall act to approve, approve with conditions, approve in part, deny or deny in part the application, within forty-five (45) days of the [ZBA] hearing. Where the [ZBA] fails to render its decision within the period required by this subsection, . . . the decision shall be deemed to have been rendered in denial of the applicant unless the applicant has agreed in writing or on the record to an extension of time.

Code § 922.07.C. Similarly, Section 922.09.D of the Code states, in pertinent part:

> The [ZBA] shall hold a public hearing on the variance application. After the public hearing, the [ZBA] shall act to approve, approve with conditions, approve in part, deny, or deny in part the application within forty-five (45) days of the [ZBA] hearing. Where the [ZBA] fails to render its decision within the period required by this subsection . . . the decision shall be deemed to have been rendered in denial of the application unless the applicant has agreed in writing or on the record to an extension of time.

Code § 922.09.D.

> The ZBA's official website specifically explains:
>
> WHEN WILL THE ZBA DECISION BE ISSUED?
>
> In many cases, the record will be closed after the hearing has completed. For in-depth cases or appeals with considerable opposition, **the ZBA may allow proposed Findings of Fact and Conclusions of Law to be submitted by each party**. Typically, **the ZBA allows two or three weeks after the hearing for these to be submitted, at which point the record will then be closed**.
>
> **After the record is closed, the ZBA will issue a decision within 45 days**. This decision will be sent via U[.]S[.] Mail to the applicant and all parties who appeared or testified and who signed the sign-in sheet with a mailing address at the hearing.

4

Supplemental Reproduced Record (S.R.R.) at 3[4] (emphasis added); http://pittsburghpa.gov/dcp/zba (last visited February 27, 2020).[5]

Here, at the close of testimony on May 17, 2018, ZBA Chairwoman Alice B. Mitinger (Mitinger) stated:

> [W]e do need to move on today. We've heard a lot, and we have a lot to consider. **But we do want to have legal positions presented by any and all who want to, and we're going to give you two weeks from the transcript to do that.**
>
> So whenever the transcript is ready, we'll take two weeks after that, and then that is flexible, based on the transcript's availability, but the [ZBA] will note that, and we'll let everybody know that.
>
> There's [sic] two counsel here who can exchange information with one another. If there are extensions one way or another that are needed, we'll entertain those requests.
>
> Thank you all for your testimony.

Reproduced Record (R.R.) at 99[6] (emphasis added). On June 12, 2018, both counsel filed their proposed findings of fact and conclusions of law.[7] *See* R.R. at 176, 211.

On July 26, 2018, 44 days after counsel submitted their proposed findings of fact, both counsel "consent[ed] to extend the time for the ZBA to reach a decision in this matter[,]" until at least August 9, 2018. R.R. at 213. On August 9,

---

[4] The supplemental reproduced record page numbers are not followed by a small "b" as required by Pennsylvania Rule of Appellate Procedure 2173, and thus are not followed by a small "b" herein.

[5] Section 923.02.C of the Code lists the ZBA's Rules and Procedures, and includes: "The [ZBA] shall adopt and maintain rules of procedure not inconsistent with the provisions of this Code." Code § 923.02.C.

[6] The reproduced record page numbers are not followed by a small "a" as required by Pennsylvania Rule of Appellate Procedure 2173, and thus are not followed by a small "a" herein.

[7] Although the record does not disclose when the transcript became available, this Court can infer that it was available two weeks before June 12, 2018.

2018, counsel agreed to another extension until August 16, 2018. *See* R.R. at 214. On August 16, 2018, a third extension was granted through August 23, 2018. *See* R.R. at 215. The ZBA filed its decision on August 23, 2018. *See* R.R. at 217.

Although the Code directs the ZBA to issue a decision within 45 days of a hearing, *see* Code §§ 922.07.C, 922.09.D, the ZBA's website makes it clear that the 45 days commences after the record is closed. Here, the ZBA clearly left the record open until 2 weeks after the transcript became available. *See* S.R.R. at 3. Before the 45 days elapsed, counsel agreed in writing to extensions, *see* R.R. at 213-215, through the filing of the ZBA's decision. *See* R.R. at 217. Because "[A]pplicant ha[d] agreed in writing . . . to an extension of time[,]" a deemed denial is not mandated by the Code. Code §§ 922.07.C, 922.09.D. Accordingly, the trial court did not err by affirming the ZBA's grant of zoning relief since the ZBA issued a written decision within 45 days after the record was closed.

Next, Objectors contend that the trial court erred by affirming the ZBA's grant of zoning relief where one of the ZBA members had an actual or apparent conflict of interest in Applicant's application and failed to recuse herself. Specifically, Objectors assert that ZBA hearing member LaShawn Burton-Faulk (Burton-Faulk) sits on Applicant's Board of Directors (Board) and has previously served as the Board's president.[8]

> This Court has explained:
>
> The general rule is that a municipal officer should disqualify [her]self from any proceeding in which [s]he has a personal or pecuniary interest that is immediate and direct. Our Supreme Court has also found that an impermissible

---

[8] This Court is cognizant of the fact that these are merely allegations raised for the first time in Objectors' brief to this Court, thus there is no evidence confirming or denying the facts stated therein. Further, when asked at oral argument before this Court when Objectors learned of the alleged conflict of interest, Objectors' counsel responded: "Long after the hearing concluded." Thus, the issue was raised at the first possible opportunity.

> commingling of adjudicatory and prosecutorial functions occurred when a zoning hearing board was advised by a solicitor who was also representing the township in the same proceeding. *Horn v.* [*Twp.*] *of Hilltown*, . . . 337 A.2d 858 ([Pa.] 1975). There it was held that actual prejudice to the rights of a party need not be shown to exist but that in order to fulfill its duties properly 'a governmental body charged with certain decision[-]making functions . . . must avoid the *appearance of possible prejudice*, be it from its members or from those who advise it or represent parties before it.' *Id.* at . . . 860 (emphasis added).

*Borough of Youngsville v. Zoning Hearing Bd. of Borough of Youngsville*, 450 A.2d 1086, 1090-91 (Pa. Cmwlth. 1982). This Court agrees that if Objectors' claims are true, Burton-Faulk's participation in the ZBA's hearing and decision may give the appearance of possible prejudice and, thus, disqualify her from participating in the hearing and the decision.

> However,

> [d]isqualification of [a] [ZBA] member . . . does not in and of itself require a reversal of the decision that was reached []. There has been no allegation that the member in question controlled or unduly influenced the other members of the [ZBA] in any manner which would raise doubts as to the validity of *their* votes.

*Id.* at 1091. Accordingly, Burton-Faulk's possible disqualification does not require reversal of the ZBA's decision.

Objectors next argue that the trial court erred by affirming the ZBA's grant of a dimensional variance allowing a FAR of 2.66:1,[9] and a variance permitting zero off-street loading space.[10] Specifically, Objectors contend that Applicant based the FAR on the consolidated lot size rather than the existing lot size which it was required to do, and granting the zero off-street loading space is a 100% deviation from the Code that would create traffic and safety problems. Applicant responds that,

---

[9] Section 904.02.C of the Code provides for a maximum FAR of 2:1.

[10] Section 914.10.A of the Code requires one off-street loading space at the Property.

because the ZBA conditioned the variance upon the Pittsburgh Planning Commission's (Planning Commission) final approval of the consolidation and Applicant's recordation thereof, the ZBA was correct in basing the FAR on the consolidated lot size, and due to past development, the need for off-street loading space cannot be otherwise met. The ZBA further rejoins that Applicant met all of the requirements set forth in Section 922.09.E of the Code for both variances.

Section 922.09.E of the Code provides:

General Conditions for Approval

No variance in the strict application of any provisions of this [] Code shall be granted by the [ZBA] unless it finds that all of the following conditions exist:

1. That there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property, and that the unnecessary hardship is due to the conditions, and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located;

2. That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property;

3. That such unnecessary hardship has not been created by the app[licant];

4. That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare; and

8

5. That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

In granting any variance, the [ZBA] may attach such reasonable conditions and safeguards as it may deem necessary to implement to purposes of this act and the zoning ordinance[.]

The applicant shall have the burden of demonstrating that the proposal satisfies the applicable review criteria.

Code § 922.09.E.

According to Applicant, the pre-development FAR is 2.67:1,[11] and the proposed FAR is 2.66:1.[12] Applicant's architect on the project, Nathan Hart (Hart), testified:

[] HART: Yes. Although we are proposing small additions on the back, we are also[,] through the [P]lanning [C]ommission[,] providing a small access alley behind the buildings.

The additional land that access alley provides actually allows us to maintain a slightly less than the [sic] FAR pre[-]development state.

[] MITINGER: So pre[-]development is 2.67[:1], and post-development would be 2.66[:1]. So you're basically maintaining an existing condition?

[] HART: In essence, yes.

[] MITINGER: **Reconfiguring but maintaining**.

[] HART: Correct.

R.R. at 57 (emphasis added).

---

[11] "Existing aggregate gross floor area: 1st floor: 4015 s.f. [+] 2nd floor: 3748 s.f. [+] 3rd floor: 3222 s.f. [=] 10,985 s.f." divided by "[t]otal lot area: 4114 s.f." equals "[p]re[-]development [FAR]" of "2.67[:1.]" R.R. at 140.

[12] "Proposed aggregate gross floor area: 1st floor: 4015 s.f. [+] 2nd floor: 3885 s.f. [+] 3rd floor: 3885 s.f. [=] 11,775 s.f." divided by "[t]otal lot area: 4424 s.f." equals "[p]roposed [FAR]:" of "2.66[:1.]" R.R. at 140.

9

With respect to the off-site loading space, Applicant's counsel (Counsel) represented:

> [] MITINGER: Is it your position that because the structure of the building extends to the property lines, essentially, all around, you don't really have any loading space, and that the loading needs for the residential use would be limited, because it would be for moving in and out?
>
> [Counsel]: That's our contention. Our contention is there's a public loading space directly in front of the building on East Ohio Street.

R.R. at 66-67.

Concerning both variances, Applicant member Mark Fatla (Fatla)[13] explained:

> Real quick, there was a suggestion that somehow this removed that strip from the historic district. It in fact remains within the historic district and will be subject to, assuming its approval -- nothing is being rezoned. Nothing is being removed.
>
> That strip will still be subject to all the requirements of the processes. **With regard to loading, it's a physical impossibility to incorporate it onto this site**.
>
> With regard to safety, the premise here -- first of all, I can't control the trucks for the liquor store or contractors of the like. There is a loading zone at the front of the building that can serve people.
>
> But, now, rather than businesses having to make their deliveries through their space, they'll be able to take on the sidewalk. They'll be able to take their deliveries around to enter through the rear of the building. This will let them put out their trash for collection in the alley, which is where the trash is collected.
>
> Nobody is suggesting that we're going to have trucks parking in the alley, but, also, in terms of alleys, it's an

---

[13] Fatla is "the head of the [L]eadership [C]onference." R.R. at 62.

ordinary alley. You are going to have vehicles, but they are going at a very low rate of speed.

There's some pedestrian activity in there, but it's like any other alley. So with regard to loading, there's a loading zone. We simply have access for the customer spaces.

Let me speak quickly -- **buildings were somewhat of a locus of legal activity for many years, predatory businesses. We had to purchase them in order to eliminate that blight**.

Also, the previous owners have not reinvested in the buildings. [sic] So we had spare roof leaks, one building that suffered a fire. So we had to purchase the buildings before they deteriorated further. **This is a preservation strategy. They are dedicated to preservation when possible**.

The economics of that -- I have a developer friend years ago who told me, 'The pencil tells me the answer.' **If I know my costs of operating, I know my costs of renovation, and I know what the market will bear in terms of revenue.**

I plug those numbers in. The pencil tells me the answer. **The reality here is, the economic need of this building, is that we need [a] sufficient number of apartments to carry the cost of the project.**

We've done so in a way that maximizes that return, while staying within the physical footprint of the building and adding the strip of the rear that actually enhances the separation from the residential districts, and meets the goals of the HRC as well.

I think we've done what we can to satisfy the economic – [. . . .]

R.R. at 95-98 (emphasis added).

With respect to the FAR, although Section 904.02.C of the Code requires a FAR of 2:1, because the proposed FAR is less than the pre-existing FAR, the ZBA concluded it was a non-conforming condition. The ZBA further concluded:

Applicant presented sufficient, credible evidence relating to the unique conditions of the site, including the existence of the building in its current configuration; that the slight reduction of the FAR, as proposed, will not have any adverse effects on the surrounding area and will allow for a secondary egress point;[14] that the FAR could not reasonably be reduced to a compliant 2:1; and that the 2.66:1 FAR, proposed, is the minimum variance that would afford relief and allow for viable redevelopment of the site.

R.R. at 15-16.

Concerning the off-street loading space, the ZBA ruled:

Applicant requests a variance to address its inability to provide an off-street loading space on the site. It provided sufficient, credible evidence to demonstrate that, since at least 1939, structures on the site extended to the lot lines and no off-street parking space has been available. It also demonstrate[d] that the new 5.6/313 [square foot] area at the rear is not of sufficient size to allow for a viable loading space. [] Applicant did not create this condition. The continued use of the existing on-street loading space that has served the site will not result in any additional impacts and will allow for continuation of an existing nonconforming condition.

R.R. at 16.

After a thorough review of the record, this Court concludes that the above-cited record evidence is substantial evidence[15] "[t]hat there are unique physical circumstances or conditions" and "[t]hat because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance[.]" Code § 922.09.E.

---

[14] *See* R.R. at 67 (Applicant's counsel represented: "And the reason, really, for adding the strip of land in the back was to provide for secondary egress from the apartments, from the residential properties.").

[15] "Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *DiMattio v. Millcreek Twp. Zoning Hearing Bd.*, 147 A.3d 969, 974 (Pa. Cmwlth. 2016) (quoting *Eichlin v. Zoning Hearing Bd. of New Hope Borough*, 671 A.2d 1173, 1175 (Pa. Cmwlth. 1996)).

12

In *Hertzberg v. Zoning Board of Adjustment of City of Pittsburgh*, 721 A.2d 43 (Pa. 1998), the Pennsylvania Supreme Court explained:

> When seeking a dimensional variance within a permitted use, the owner is asking only for a reasonable adjustment of the zoning regulations in order to utilize the property in a manner consistent with the applicable regulations. Thus, the grant of a dimensional variance is of lesser moment than the grant of a use variance, since the latter involves a proposal to use the property in a manner that is wholly outside the zoning regulation.

*Id.* at 47. "[T]he quantum of proof required to establish unnecessary hardship is indeed lesser when a dimensional variance, as opposed to a use variance, is sought." *Id.* at 48. Further,

> where blighted or dilapidated conditions exist in urban areas, and where the applicant for a variance has undertaken efforts to remediate or renovate those areas for a salutary, productive purpose, *a slight relaxation, or less stringent application of the variance criteria may be the only way the subject property will be put to any beneficial use*.

*Id.* at 49 (quoting in *Vitti v. Zoning Bd. of Adjustment of the City of Pittsburgh,* 710 A.2d 653, 658 (Pa. Cmwlth. 1998)).

Here, Fatla testified, that the buildings were somewhat of a locus of legal activity and predatory businesses for many years, and that Applicant had to purchase them in order to eliminate that blight. Further, he related that it was a preservation strategy, the reality of which is that a sufficient number of apartments are required to carry the cost of the project. This evidence supports the existence of the unnecessary hardship and Applicant's need to obtain dimensional variances from the Code's FAR and off-street loading space requirements in order to remediate and preserve what has become deteriorated buildings in this neighborhood. Accordingly, the trial court properly affirmed the ZBA's grant of a dimensional variance allowing a FAR of 2.66:1, and a variance permitting zero off-street loading space.

13

Objectors further assert that the trial court erred by affirming the ZBA's grant of special exceptions permitting a restaurant use in the LNC district,[16] off-site parking,[17] and a 5.61-foot rear setback of a property within 50 feet of a RIA-VH zoning district.[18] Specifically, Objectors contend that, since the restaurant use was abandoned, it is no longer a permitted non-conforming use; substantial evidence does not support the number of parking spaces purportedly available for sublease; and extending LNC district uses beyond the boundaries does not mitigate the impact of such uses. The ZBA rejoins that, pursuant to Section 921.02.B.2(d) of the Code, the restaurant use was not abandoned; Applicant presented a letter of intent from Priory Hospitality, Inc.'s (Priory) Chief Executive Officer (CEO) to sublease 6 parking spaces from Priory's Nash Street lot; and, while zoned residential and historical, the consolidated strip will act as a buffer and offer a level of setback.

> This Court has explicated:
>
> > Generally speaking, '[a] special exception is not an exception to a zoning ordinance, but rather a use which is expressly permitted, absent a showing of a detrimental effect on the community.' *Manor Healthcare Corp. v. Lower Moreland* [*Twp.*] *Zoning Hearing* [*Bd.*], . . . 590 A.2d 65, 70 ([Pa. Cmwlth.] 1991). In other words, as stated in our seminal decision in *Bray v. Zoning Board of Adjustment*, . . . 410 A.2d 909, 911 ([Pa. Cmwlth.] 1980), '[t]he important characteristic of a special exception is that it is a conditionally permitted use, legislatively allowed if the standards are met.'
> >
> > This Court recently explained that an applicant for a special exception has both the duty of presenting evidence and the burden of persuading the zoning hearing board that the proposed use satisfies the objective requirements of the zoning ordinance for the grant of [a] special exception.

---

[16] Section 911.02 of the Code permits a restaurant in the LNC district as a special exception.
[17] Section 914.04.G.1(a) of the Code permits off-street parking as a special exception.
[18] Section 916.09 of the Code permits reduced rear setbacks as a special exception.

*Tower Access Grp., LLC v. S. Union Twp. Zoning Hearing Bd.*, 192 A.3d 291, 300 (Pa. Cmwlth. 2018).

Section 922.07.D.1 of the Code specifies the "General Criteria" for special exceptions:

> The [ZBA] shall approve [s]pecial [e]xceptions only if (1) the proposed use is determined to comply with all applicable requirements of this Code and with adopted plans and policies of [Pittsburgh] and (2) the following general criteria are met:
>
> (a)   That the development will not create detrimental visual impacts, such that the size and visual bulk of the proposed development is determined to create an incompatible relationship with the surrounding built environment, public streets and open spaces and land use patterns;
>
> (b)   That the development will not create detrimental transportation impacts, such that the proposed development is determined to adversely affect the safety and convenience of residential neighborhoods or of vehicular and pedestrian circulation in the vicinity of the subject tract;
>
> (c)   That the development will not create detrimental transportation impacts, such that the proposed development will result in traffic volumes or circulation patterns that substantially exceed the capacity of streets and intersections likely to be used by traffic to and from the proposed development;
>
> (d)   That the development will not create detrimental operational impacts, including potential impacts of hours of operation, management of traffic, servicing and loading operations, and any on-site operations associated with the ongoing functions of the use on the site, in consideration of adjacent and surrounding land uses which may have differing sensitivities to such operational impacts;
>
> (e)   That the development will not create detrimental health and safety impacts, including but not limited to potential impacts of noise, emissions, or vibrations from the proposed development, or functions within the proposed site which

would otherwise affect the health or safety of others as a direct result of the operation of the proposed use;

(f)   That the development will not create detrimental impacts on the future and potential development of parcels in the vicinity of the proposed site of the development; and

(g)   That the development will not create detrimental impacts on property values.

Code § 922.07.D.1.

With respect to Applicant's proposed restaurant use, "Restaurant (General)" is listed as a special exception in the use table under Section 911.02 of the Code, and the "Use Standards" are described in Section 911.04 of the Code. Specifically, Section 911.04.A.57(a) of the Code provides:

In LNC . . . Districts.

Restaurant (General) uses shall be subject to the following standards in the LNC. . . Districts:

(1)   Parking facilities and access shall be designed and located to clearly meet the demand of the facility in a way which does not interfere with parking spaces required for surrounding residential uses;

(2)   Off-site impacts of the use, which are directly attributed to activities occurring on-site, shall be controlled to avoid conflicts with surrounding residential use; and

(3)   The proposed use shall be subject to the Site Plan Review procedures of Section 922.04 [of the Code].

Code § 911.04.A.57(a).

Relative to the restaurant use, Hart testified:

[] MITINGER: If it had been used as restaurants previously, and the request is for reconfiguration and renovating, for whichever restaurant is so lucky to be in this renovated building.

[] HART: Indeed.

16

[] MITINGER: I guess the question is, what is the square footage, because that would be part of our understanding of the parking needs.

And if there's an understanding as to whether any additional square footage is being used for the restaurant use, or you just are maintaining what had been there --

[] HART: **There would be a small increase in the square footage**. We are looking at expanding, **to provide potentially restroom space**.

We had been informed by city planning that the overall parking count, and we'll get to this obviously in the next discussion, **it would require one additional parking space for the commercial use.**

R.R. at 58-59 (emphasis added).

Fatla further testified:

[] MITINGER: And it is intended that the restaurant use would be generally consistent with the restaurant that was there previously, in terms of operations?

[] FATLA: I'll speak to that. Yes, albeit, hopefully different terms of quality. But the nature of the operation would be similar.

[] MITINGER: As the owner of the building, would you propose any requirements about hours of operation, or anything of that nature?

[] FATLA: My guess is that would be part of the discussion during the lease process, and the neighboring organization would be involved in that conversation.

Typically, we're looking at closures around 11:00 or 12:00, but there are existing bars on this street. So it's an active, shall we say, restaurant and bar district.

R.R. at 59-60.

With respect to the parking spaces, Fatla declared: "[W]ith regard to commercial parking, there's a commercial lot for the walkway, which will primarily

17

serve a restaurant nature. That lot is no more than a third occupied – it's vastly underutilized." R.R. at 69.

In the instant matter, the ZBA concluded:

15. [] Applicant seeks a special exception to allow the restaurant (general) use in the LNC [d]istrict, within the space previously used for a restaurant on the first and second floors of the building on the 408-410 East Ohio Street po[r]tion of the site.

16. The existing valid 1991 Certificate of Occupancy permits the restaurant use. **To the extent that [] Applicant proposes to expand the use by 240 [square feet], it has demonstrated compliance with the Code's criteria for the special exception**. No credible evidence and only speculation of any detrimental impact was presented in opposition to the proposed restaurant use.

R.R. at 16 (emphasis added).

Because the location has been used as a restaurant since 1991, Hart testified the additional 240 square feet was intended to be used for restrooms and required only one additional parking space, and Fatla testified to available parking spaces within walking distance and the neighboring community's involvement with discussions concerning the hours of operation, this Court concludes the trial court properly affirmed the ZBA's grant of a special exception permitting a restaurant use in the LNC district.

Concerning the off-site parking, Section 914.07.G.2 of the Code provides, in relevant part:

The [ZBA] shall be authorized, in accordance with the Special Exception provisions of Sec[tion] 922.07 [of the Code], to consider and approve any alternative to providing off-street parking spaces on the site of the subject development if the applicant demonstrates to the satisfaction of the [ZBA] that the proposed plan will result in a better situation with respect to surrounding neighborhoods, citywide traffic circulation and urban

18

design than would strict compliance with otherwise applicable off-street parking standards.

(a)  Off-Site Parking

The [ZBA] shall be authorized, in accordance with the Special Exception provisions of Sec[tion] 922.07 [of the Code], to permit all or a portion of the required off-street parking spaces to be located on a remote and separate lot from the lot on which the primary use is located, subject to the following standards.

(1)  Location

**No off-site parking space shall be located more than one thousand (1,000) feet from the primary entrance of the use served**, measured along the shortest legal, practical walking route.  This distance limitation may be waived by the [ZBA] if adequate assurances are offered that van or shuttle service will be operated between the shared lot and the primary use.

(2)  Zoning Classification

Off-site parking areas shall be considered accessory uses of primary uses that the parking spaces are intended to serve. Off-site parking areas shall require the same or a less restrictive zoning classification than that required for the use served.

(3)  Report from Planning Director

The [ZBA] shall request a report and recommendation from the Planning Director on the planning aspects of the proposed shared parking use.

(4)  Off-Site Parking Agreement

**In the event that an off-site parking area is not under the same ownership as the primary use served, a written agreement among the owners of record shall be required**.  An attested copy of the agreement between the owners of record shall be submitted to County Recorder's Office for recordation on forms made available in the office of the Zoning Administrator.  Proof of recordation of the agreement shall be presented to the Zoning Administrator prior to issuance of a building permit.  An off-site parking

19

agreement may be revoked by the parties to the agreement only if off-street parking is provided on-site pursuant to Sec[tion] 914.02.A [of the Code] or if an Alternative Access and Parking Plan is approved by the [ZBA] pursuant to Sec[tion] 914.07 [of the Code].

Code § 914.07.G.2.

Here, Applicant's Counsel explained: "If you look in our exhibit book, I believe it's Exhibit[s] 9 through 11, you will see we entered into an agreement with [] Priory, to use space in their lot."  R.R. at 60.  Exhibit 9 is a copy of a letter from Priory's President and CEO, which states:

> Pursuant to the required off-street parking for the redevelopment of the properties that [Applicant] is developing at 404-410 East Ohio Street, [Priory] will to be happy to sublease six (6) reserved parking stalls to [Applicant] from its parking lot on Nash Street.  Note the Nash Street parking lot is leased to the [Priory] by the City of Pittsburgh until 2044, at which time the lease is renewable for another 49 years.

R.R. at 134.

The ZBA concluded:

> Applicant also seeks a special exception to provide six off-site parking spaces on a lot, owned by [] Priory, at the corner of East Ohio Street and Nash Street.  That site is within 1,000[] [feet[19]] of the primary entrance of the building at issue, within the same LNC [d]istrict, and [] Applicant intends to record its lease for the spaces in that lot.  Substantial evidence thus supports [] Applicant's compliance with the criteria for the proposed special exception and no substantial, or credible evidence of any detrimental impact of the proposed off-site parking arrangement was presented.

---

[19] Hart testified that "[i]t's less than a thousand linear feet from the entrance door of the residences or the commercial buildings to the parking lot."  R.R. at 72.  Exhibit 11 describes that the "[t]otal distance [is] 999.00 [feet.]"  R.R. at 136.

R.R. at 16. This Court concludes that Applicant has complied with the off-site parking standards. Accordingly, the trial court properly affirmed the ZBA's grant of a special exception for off-site parking.

Relative to the 5.61-foot rear setback of a property within 50 feet of a RIA-VH district, Section 916.02.A.7 of the Code mandates a minimum 15-foot rear setback for any property that abuts the interior sideyard of an "R" zoned lot. Code § 916.02.A.7. Pursuant to Section 916.09 of the Code,

> [t]he [ZBA] may approve a Special Exception according to the provisions of Sec[tion] 922.07 [of the Code] to waive one (1) or more of the Residential Compatibility Standards imposed by this Chapter, subject to the following standards:
>
> A. The [ZBA] shall determine that the waiver will not create detrimental impacts on the surrounding properties, taking into consideration the physical relationship of the proposed use and structure to surrounding residential uses and structures; [and]
>
> B. The [ZBA] shall impose alternative methods which will cause the development to comply with the purpose of the Residential Compatibility Standards;
>
> . . . .

Code § 916.09.

> The ZBA concluded:
>
> The current configuration of the building does not conform to this Standard and [] Applicant has made an effort to mitigate the impact of the LNC [district] uses on the R [d]istrict by acquiring the additional area and creating a rear setback, where none existed. [] Applicant recognizes that this area is within an historic district and that its proposed use is also subject to the Historic Review Commission's review. From a zoning perspective, no substantial or credible evidence was presented of any detrimental impact that would preclude [a] grant of the requested waiver of the residential compatibility standard.

21

R.R. at 16. Because the ZBA considered the impact of the proposed development on the adjoining R district, observed that Applicant had provided an alternative method of protecting the neighboring residential properties through the acquisition of the strip of land (the use of which was restricted due to its location in a historic district), and found that no credible evidence of detriment to the surrounding properties was presented, this Court concludes that the ZBA did not err in granting the special exception allowing for the waiver of the 15-foot rear setback requirement for the Property. Accordingly, the trial court properly affirmed the ZBA's grant of a waiver of the Residential Compatibility Standards.

Finally, Objectors maintain that the trial court erred by affirming the ZBA's grant of zoning relief where, even with the relief requested, the proposed development would not comply with zoning requirements. Specifically, Objectors contend that Applicant's proposed plan violates Section 914.06.A of the Code by not providing parking for disabled persons. However, because the trial court did not take additional evidence, our review is limited to the ZBA's determinations. *See Society Hill Civic Ass'n*. Accordingly, since Section 914.06.A of the Code was not before the ZBA, it is not now before this Court.

For all of the above reasons, the trial court's order is affirmed.


_____
ANNE E. COVEY, Judge

22

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stephen Pascal and Chris Gates,      :
            Appellants      :
                                 :
            v.                 :
                                 :

City of Pittsburgh Zoning Board of  :
Adjustment, and City of Pittsburgh  :    No. 496 C.D. 2019
and Northside Leadership Conference  :

## O R D E R

AND NOW, this 28th day of February, 2020, the Allegheny County Common Pleas Court's March 27, 2019 order is affirmed.

_____
ANNE E. COVEY, Judge